**UNITED STATES of America, Appellee,**

v.

**Manuel CONCEPCION, Roberto Aponte, and Nelson Frias, Defendants–Appellants.**

Nos. 1660, 1663 and 1664, Dockets 91–1151(L), 91–1179, 91–1341 and 91–1424.

United States Court of Appeals, Second Circuit.

Argued June 22, 1992.

Decided Dec. 28, 1992.

Order on Denial of Rehearing and Rehearing In Banc March 25, 1993.

Dissenting Opinion to Denial of Rehearing In Banc March 25, 1993.

370

**374**

Peter R. Ginsberg, Asst. U.S. Atty., Brooklyn, NY (Andrew J. Maloney, U.S. Atty. E.D.N.Y., Peter A. Norling, Susan Corkery, Emily Berger, Edward A. Rial, Asst. U.S. Attys., Brooklyn, NY, on the brief), for appellee.

Alan S. Futerfas, New York City (Gerald L. Shargel, New York City, on the brief), for defendant-appellant Manuel Concepcion.

Bettina Schein, New York City, for defendant-appellant Roberto Aponte.

John M. Apicella, Brooklyn, NY, for defendant-appellant Nelson Frias.

Before: VAN GRAAFEILAND, NEWMAN, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Manuel Concepcion, Roberto Aponte, and Nelson Frias appeal from judgments entered in the United States District Court for the Eastern District of New York following a jury trial before Arthur D. Spatt, *Judge*, convicting them of various racketeering, narcotics, money laundering, and weapons offenses. Concepcion and Aponte were convicted of participating in the affairs of an enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (1988); possessing and conspiring to possess large quantities of narcotics with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1988); and committing violent crimes for the purpose of maintaining or increasing their positions in a racketeering enterprise, in violation of 18 U.S.C. § 1952B (Supp. II 1984), *renumbered* 18 U.S.C. § 1959 (1988) (collectively "§ 1959") by Pub.L. 100–690, § 7053(b), 102 Stat. 4181, 4402 (1988), and 18 U.S.C. § 2 (1988). In addition, Concepcion was convicted of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (1988), and possessing a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (1988). Concepcion was sentenced principally to life imprisonment plus five years' imprisonment, to be served consecutively, and was ordered to pay a $1,000,000 fine. Aponte was sentenced principally to life imprisonment. Frias was convicted of possessing an unregistered firearm, in violation of 26 U.S.C. § 5861(d) (1988), and possessing weapons as a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (1988). He was sentenced principally to two 120–month terms of imprisonment, to be served consecutively.

On appeal, defendants make a number of challenges to their convictions and sentences. Concepcion and Aponte contest, *inter alia*, the applicability of § 1959 to their conduct, the sufficiency of the evidence to support their convictions under that section, and the trial court's rulings with respect to the admissibility of certain evidence. Frias contends that the district

court impermissibly enhanced his sentence on the basis of conduct of which he was acquitted, imposed consecutive sentences in violation of his right to be free from double jeopardy, and miscalculated his sentence under the federal Sentencing Guidelines ("Guidelines" or "1988 Guidelines"). For the reasons below, we vacate Frias's sentence and remand for resentencing. In all other respects, we affirm.

## I. BACKGROUND

In 1989, Concepcion, Aponte, and Frias, along with some three dozen other individuals, were indicted on a variety of charges arising out of their operation, primarily in the Williamsburg and East New York sections of Brooklyn, of a wholesale and retail narcotics organization known as the "Unknown Organization" ("Organization"). Taken in the light most favorable to the government, the evidence at trial, which included the testimony of a dozen accomplices and several government informants, showed the following.

### A. *The Organization's Operations*

The Organization consisted of a highly structured distribution network that purchased relatively pure narcotics, cut and packaged them, and then sold them through 24–hour street sales locations known as "spots." At its peak, the Organization received gross income from heroin sales of more than $10 million a month.

Prior to 1988, the Organization was run by Ricardo Melendez, and Concepcion was a lieutenant responsible for its retail distribution operations in Williamsburg. In September 1988, Melendez was arrested and Concepcion became the Organization's leader. In that role, Concepcion was in charge of all day-to-day activities until his own arrest in March 1989.

The Organization employed hundreds of people, and employee loyalty was maintained chiefly by means of intimidation. To those who interfered with or stole from it, the Organization often meted out violent punishment, and the record includes evidence of a substantial number of murders and mutilations. For example, in August 1988, George Espada, a low-level Organization member, was suspected of stealing approximately $100,000 of the Organization's profits. To recover these moneys and reaffirm the Organization's authority, Concepcion and five subordinates kidnaped Espada. They took him to a garage owned by Concepcion in Williamsburg and proceeded to bind, gag, beat, kick, shoot, and stab him for several hours. Concepcion himself stabbed Espada numerous times and donned boots in order to give more force to his kicks.

The Organization also used violence to rebuff territorial challenges by rival groups. For example, in May 1988, rival drug dealers initiated a dispute over control of a retail drug location on Metropolitan Avenue in Williamsburg. When informed of trouble at that "spot," Concepcion promptly went there, accompanied by three subordinates, to take care of the matter. As they approached with their guns drawn, one James Gines stepped up to Concepcion and attempted to stop him. Concepcion, much the larger man, shook Gines off and shot him; he then repeatedly shot Gines as Gines attempted to run away. There ensued a general shootout, during which Concepcion continued firing until his gun jammed. By the end of the gunfight, Concepcion and two bystanders, Wilfredo Ortiz and Luis Reyes, had also been shot. Gines, Ortiz, and Concepcion were taken to the hospital, where Gines died. As discussed in greater detail in Part II.A. below, Ortiz and Gines's girlfriend Lea Lopez identified Concepcion at the hospital as the person who had struggled with and shot Gines.

Defendant Roberto Aponte ("Aponte"), whose street name was "Savage," was one of the Organization's enforcers and was employed principally in East New York to control business activities there. In late 1988, one Robert Aponte ("Robert"), who was unrelated to defendant Aponte, was pressuring Concepcion for a share of the profits made by the Organization from sales at a building Robert owned. When Concepcion refused, Robert made a number of threats, and in early February 1989 Con-

cepcion asked Aponte to take care of the matter. Aponte tried, but at first failed because, he said, Robert was too "slick." On February 23, however, Concepcion gave Aponte a gun, and Aponte assured him that he would "take care of" Robert that day. Aponte then found Robert in a local grocery store and, in the presence of witnesses, shot Robert repeatedly, killing him. At Concepcion's garage the next day, Aponte fully described to other members of the Organization how he had shot and killed Robert. Concepcion rewarded Aponte with $10,000 and a diamond Rolex watch.

### B. *The Arrests and the Present Prosecution*

In March 1989, Concepcion, Aponte, and several other Organization members sought to purchase roughly 7½ kilograms of pure heroin from a government informant. At a meeting on March 14, 1989, Organization members paid the informant approximately $1.1 million in cash for supposed bricks of heroin. Government agents interrupted the transaction and arrested Concepcion, Aponte, and the others, seizing the cash and three weapons. As discussed in Part II.D. below, Frias was arrested several months later during the execution of a search warrant at his apartment.

Indictments were handed down against some 39 individuals, charging various defendants with, *inter alia*, narcotics distribution and conspiracy, racketeering, murder and kidnaping in furtherance of racketeering activity, and money laundering. Concepcion, Aponte, Frias, and seven others were tried together in a four-month jury trial. Concepcion was convicted on one count of participating in the affairs of an enterprise through a pattern of racketeering activity, in violation of RICO, 18 U.S.C. § 1962(c); one count of narcotics conspiracy and one count of attempting to possess heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846; four counts of committing violent crimes for the purpose of maintaining or increasing his position in the Organization, in violation of 18 U.S.C. §§ 1959 and 2; three counts of money laundering, in violation of

18 U.S.C. § 1956(a)(1)(B)(i); and one count of using a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). The jury acquitted Concepcion on one count of attempted murder in aid of racketeering activity and one count of money laundering. Aponte was convicted on one count of participating in the affairs of an enterprise through a pattern of racketeering activity, in violation of RICO, 18 U.S.C. § 1962(c); one count of narcotics conspiracy and one count of attempting to possess heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and one count of murder for the purpose of maintaining or increasing his position in the Organization, in violation of 18 U.S.C. § 1959. Aponte was acquitted on one additional count of murdering another individual for that purpose. Frias, who was not charged with RICO offenses, was acquitted of narcotics conspiracy and of using a firearm in relation to a narcotics trafficking offense; he was found guilty on one count of possessing an unregistered firearm, in violation of 26 U.S.C. § 5861(d), and one count of possessing weapons as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

As indicated above, Concepcion was sentenced principally to life imprisonment, plus a mandatory consecutive five-year term of imprisonment on the § 924(c)(1) count, and was ordered to pay a $1,000,000 fine. Aponte was sentenced principally to life imprisonment. Frias, based in part on evidence that he had possessed his firearms in furtherance of the Organization's narcotics operations, was sentenced to the statutory maximum of 120 months' imprisonment on each count of conviction, to be served consecutively, for a total of 240 months.

## II. DISCUSSION

On appeal, defendants make a number of arguments, including (1) challenges by Concepcion and Aponte to the district court's admission of in-court identification testimony against them and to their convictions under § 1959, and (2) Frias's contentions that the district court improperly enhanced

his sentence on the basis of conduct of which he was acquitted, and that the imposition of the two sentences consecutively violated his right to be free from double jeopardy. For the reasons below, we find merit only in one of Frias's challenges to his sentence. ·

A. *Challenges to the Identification Testimony*

At trial, Concepcion was identified by Ortiz and Lopez as the person who shot Gines. Aponte was identified by one Nephtali Gonzalez as the person who shot and killed Robert. Both defendants contend that the identifications should have been excluded as the product of impermissibly suggestive pretrial identification procedures.

■■■ A defendant's right to due process includes the right not to be the object of suggestive police identification procedures that create "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *accord Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *see also Manson v. Brathwaite*, 432 U.S. 98, 106 n. 9, 114, 97 S.Ct. 2243, 2249 n. 9, 2253, 53 L.Ed.2d 140 (1977). This principle applies both to showups, *see, e.g., Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir.1978), and to photographic identifications, *see, e.g., Simmons v. United States*, 390 U.S. at 384, 88 S.Ct. at 971; *Jarrett v. Headley*, 802 F.2d 34, 40–41 (2d Cir.1986).

■■In general, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. at 302, 87 S.Ct. at 1972. Although under extenuating circumstances a showup might be permissible, *see id.* (hospital showup permitted where victim was believed to be dying), such practices should be avoided where there is no overriding necessity for their use, *see, e.g., Joshua v. Maggio*, 674 F.2d 376, 377–78 (5th Cir.) (where defendants and robbery victims taken to hospital for treatment of noncritical injuries, hospital showup unduly suggestive), *cert. denied*, 459 U.S. 992, 103 S.Ct. 351, 74 L.Ed.2d 389 (1982). In determining whether a showup was constitutionally permissible, the court must carefully consider all of the surrounding circumstances.

■■ The fairness of a photographic array depends on a number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents. If there is nothing inherently prejudicial about the presentation, such as use of a very small number of photographs, *see, e.g., United States v. Bennett*, 409 F.2d 888, 898 (2d Cir.) (array of six not so small as to be impermissibly suggestive), *cert. denied*, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969), or the use of suggestive comments, the "principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit,'" *Jarrett v. Headley*, 802 F.2d at 41 (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984)).

■■ If pretrial procedures have been unduly suggestive, the court must determine whether an in-court identification will be the product of the suggestive procedures or whether instead it is independently reliable. The factors to be considered include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–83; *accord Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253. A good or poor rating with respect to any one of these factors will generally not be dispositive. For example, the absence of a prior description by the witness does not necessarily render his or

her subsequent identification suspect. *See, e.g., United States v. Butler*, 970 F.2d 1017, 1021 (2d Cir.1992), *petition for cert. filed* (Sept. 21, 1992). Similarly, an interval of several months between the event and the identification, though a negative factor, is not determinative if it is outweighed by other indicia of reliability. *See, e.g., United States v. Jacobowitz*, 877 F.2d 162, 168 (2d Cir.) (10 months not dispositive where other factors were sufficiently positive), *cert. denied*, 493 U.S. 866, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989). In each case, the factors must be assessed in light of the totality of the circumstances, and the linchpin of admissibility is reliability.

With these principles in mind, we turn to the contentions of Concepcion and Aponte.

### 1. Concepcion

■ Concepcion contends that the testimony of Ortiz and Lopez should have been excluded because they first identified him at the hospital in what we agree were unduly suggestive showups. We conclude that the district court properly admitted the identification testimony of both witnesses, however, after performing the *Neil v. Biggers* analysis.

Ortiz and Lopez were on the street as Concepcion and his men walked down the block. Both testified that they had watched as Concepcion, with gun drawn, struggled with Gines and shot him. Though they turned and ran as Concepcion directed his attention to them and others, they had had an adequate opportunity to observe him as he dealt with Gines, and the nature of the events was such as to attract and hold their attention. Further, while neither Ortiz nor Lopez had given the authorities a description of Concepcion prior to identifying him at the hospital, their identifications were made within hours or minutes of the shooting, and they were unequivocal. We see no error in the district court's conclusion that the pretrial identifications by those two witnesses were sufficiently reliable to warrant admission of their in-court identifications.

### 2. Aponte

Aponte contends that Gonzalez's identification of him was unreliable for several reasons. Gonzalez was first shown photographs of suspects roughly six months after Robert's murder. The first array he was shown consisted of mug shots of Aponte and five others, but Gonzalez was unable to select Robert's killer from the group. The police then assembled a second six-photo array, which also included Aponte's photograph. Gonzalez eventually selected Aponte's picture, but only after studying the second array for a half hour. At a *Wade* hearing during trial, *see United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), when Gonzalez was asked whether he could select Robert's killer from among the defendants seated in the courtroom, he at first identified codefendant Fernando Alvarez, not Aponte. Only after being informed that he had selected the wrong man did Gonzalez identify Aponte. Aponte contends that the first photo array was impermissibly suggestive because his picture bore a legend indicating that he had been arrested in Manhattan, whereas the others bore legends indicating that they had been arrested in Brooklyn. He challenges the second array on the ground that the inclusion of his picture, in light of its presence in the first array just reviewed by Gonzalez, impermissibly suggested to Gonzalez that he should select Aponte's picture. He contends that the in-court identification of him by Gonzalez as the man who shot and killed Robert was the product of, *inter alia*, these photographic identification procedures, and he argues that the unreliability of Gonzalez's photographic identification was underscored by his initial selection of a defendant other than Aponte at the *Wade* hearing.

■ Individually, these challenges must be rejected. An array is not unduly suggestive merely because legends on the pictures reveal that the defendant was arrested in one borough and the other persons were arrested in another. *United States v. Archibald*, 734 F.2d at 940. Further, it is unlikely that the "Manhattan"

legend on Aponte's photo, in contrast to the "Brooklyn" legends on the others, suggested to Gonzalez that he should select Aponte's picture, given that the killing of Robert took place in Brooklyn. Indeed, Gonzalez failed to select Aponte's picture from that array. Nor does the fact that a suspect's picture was placed in a second array after a witness has failed to select anyone from the first array automatically make the second array unduly suggestive. *United States v. Maguire*, 918 F.2d 254, 263 (1st Cir.1990) (suspect's inclusion in two photospreads, even with same photo, not constitutionally impermissible), *cert. denied*, —— U.S. ——, 111 S.Ct. 1421, 113 L.Ed.2d 474 (1991); *see United States v. DiPalermo*, 606 F.2d 17, 21 (2d Cir.1979) (per curiam) (criticizing multiple showings of defendant's photograph but concluding that procedure did not create substantial likelihood of misidentification), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980). And the fact that a witness does not initially identify the defendant during a *Wade* hearing does not necessarily make an eventual in-court identification impermissible. *United States v. Maldonado–Rivera*, 922 F.2d 934, 976 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991).

■■■ Normally if the pretrial procedures were not unduly suggestive any question as to the reliability of the proposed in-court identification will affect only the identification's weight rather than its admissibility. *See, e.g., Foster v. California*, 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 1128 n. 2, 22 L.Ed.2d 402 (1969). A witness's inability to identify the defendant at a *Wade* hearing, however, "introduce[s] a need for further consideration," *see United States v. Maldonado–Rivera*, 922 F.2d at 975, and in the present case Gonzalez's responses, considered in combination and viewed in the totality of the circumstances, raised such serious questions of reliability as to require the court to employ the *Neil v. Biggers* analysis to determine whether or not to allow Gonzalez to identify Aponte at trial. In his *Wade* hearing, Gonzalez testified that he was in the grocery store, facing the door, when a man wearing a baseball cap entered, repeatedly shot Robert, and left. Though Gonzalez had been just four or five feet away from the killer and characterized his opportunity to observe as good, he implied that at least some of the killer's face was covered ("[n]ot much" was covered), and he testified that he had "just a quick look" at the shooter, as the entire incident took only 5–7 seconds: "It was just a quick look. Just like this and that's it." Gonzalez had never seen the shooter before, and he gave no description to the authorities. He was not shown a photo array until some six months later. None of these factors strongly indicated that Gonzalez could reliably identify the killer, and all of them should have been evaluated in the light of his complete inability to identify Aponte from the first array, his inability for nearly a half hour to identify Aponte from the second array, and his initial selection of a defendant other than Aponte at the *Wade* hearing. In sum, the *Neil v. Biggers* analysis should have indicated that Gonzalez's pretrial identifications were not sufficiently reliable to permit him to identify Aponte at trial.

■■■ Nonetheless, we conclude that even if the admission of Gonzalez's testimony was error, it was harmless in light of the record as a whole, for the other evidence that Aponte was Robert's killer was overwhelming. Thus, one Diane Rodriguez observed the shooting and was confident in her identification of Aponte as the murderer, both initially when shown a photo-array and thereafter at trial. Aponte does not challenge here the admission of her identification. Further, two Organization members testified that Aponte had committed the murder at Concepcion's behest. One, Adam Pomales, testified that on the day of the murder Aponte said he had just missed killing Robert the day before but would "get him" that day; that Concepcion then gave Aponte a gun, and Aponte promised Concepcion that "it will be done today in 20 minutes," and departed; that Concepcion then asked Pomales, who functioned as, *inter alia*, Concepcion's treasurer, to give him $10,000 for Aponte because Aponte "was going to knock off Robert"; and that

when word arrived later that evening that Robert had been killed, he and Concepcion went to meet Aponte, and Concepcion gave Aponte the $10,000. Pomales also testified that at Concepcion's garage on the following day, Aponte fully described to Pomales and Concepcion how Aponte had shot and killed Robert. In all the circumstances, the admission of Gonzalez's identification testimony was harmless beyond a reasonable doubt.

### B. *The Requirements of § 1959*

Counts 17, 19, and 28 of the indictment alleged that various defendants had committed crimes of violence for the purpose of maintaining or increasing their respective positions in the Organization, in violation of 18 U.S.C. §§ 1959 and 2. To the extent relevant here, counts 17 and 19, respectively, alleged that Concepcion had murdered Gines and assaulted Ortiz and Reyes for that purpose; count 28 charged that Concepcion and Aponte had murdered Robert for that purpose. Concepcion and Aponte contend that their convictions on these counts should be reversed because, in accordance with the "rule of lenity," § 1959 must be interpreted as requiring the government to prove that when they performed the acts of violence they had the "specific intent" to maintain or increase their positions in the RICO enterprise. For several reasons, we reject their contentions.

▮ Preliminarily, we note that the "rule of lenity" assists the court in interpreting a criminal statute only if the statute is ambiguous. " 'The rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.' " *United States v. Turkette,* 452 U.S. 576, 587 n. 10, 101 S.Ct. 2524, 2531 n. 10, 69 L.Ed.2d 246 (1981) (quoting *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961)). Accordingly, we begin with an examination of the statute itself, giving its words their fair meaning in accordance with the intentions manifested by Congress. *Bifulco v. Unit-*

*ed States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). In the absence of contrary congressional direction, we interpret the language in accordance with its ordinary meaning. *See, e.g., Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990).

▮ Section 1959, which was enacted to complement RICO, *see generally* S.Rep. No. 225, 98th Cong., 1st Sess. 304–07 (1983) ("S.Rep. No. 225"), *reprinted in* 1984 U.S.Code Cong. & Admin.News ("USCCAN") 3182, 3483–87, provides, in pertinent part, as follows:

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished....

18 U.S.C. § 1959(a). Section 1959(b)(1) states that § 1959(a) uses the term "racketeering activity" as that term is defined in RICO. In addition, a § 1959 "enterprise" is plainly a RICO enterprise. Section 1959(b)(2) defines "enterprise" to

include[ ] any partnership ... association, or other legal entity, and any ... group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce.

This definition differs from the RICO definition of enterprise only in that it includes the commerce requirement, whereas in RICO that requirement appears in each of the sections stating substantive prohibitions of activities with respect to enterprises, rather than in the definition of enterprise. *Compare* 18 U.S.C. § 1959(b)(2) *with id.* §§ 1961(4), 1962(a)–(c). Further, § 1959's legislative history states that the

term enterprise in both § 1959 and RICO was meant to "have the same scope." S.Rep. No. 225, at 307, *reprinted in* 1984 USCCAN at 3486. Thus, § 1959 complements RICO by allowing the government not only to prosecute under RICO for conduct that constitutes a pattern of racketeering activity in connection with an enterprise, but also to prosecute under § 1959 for violent crimes intended, *inter alia*, to permit the defendant to maintain or increase his position in a RICO enterprise.

■ The phrase "for the purpose of ... maintaining or increasing position in" the enterprise, accorded its ordinary meaning, appears to refer to a defendant who holds a position in a RICO enterprise and who committed an underlying crime of violence with a motive of retaining or enhancing that position. With respect to the motive element, the legislative history contains no indication that Congress meant to require proof that self-promotion was the defendant's only or primary concern. Rather, the history states that this phrase was included as a means of proscribing murder and other violent crimes committed "as an integral aspect of membership" in such enterprises. S.Rep. No. 225, at 304, *reprinted in* 1984 USCCAN at 3483; *see also id.* at 306, *reprinted in* 1984 USCCAN at 3486 (performed "as an aspect of membership"). Given this explanation and given that Congress intended RICO, which § 1959 complements, to " 'be liberally construed to effectuate its remedial purposes,' Pub.L. 91–452, § 904(a), 84 Stat. 947," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985), we reject any suggestion that the "for the purpose of" element requires the government to prove that maintaining or increasing position in the RICO enterprise was the defendant's sole or principal motive. We consider the motive requirement satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.

■ In sum, in light of the guidance given by the statute and its legislative history, and giving the phrase "maintaining or increasing" its ordinary meaning, we conclude that in order to establish a direct violation of § 1959 in the present case, the government was required to prove beyond a reasonable doubt (1) that the Organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise.

■ In arguing that a prosecution under § 1959 requires proof of "specific intent," Concepcion also contends that the government was required to prove that the actual victim of the violence was the intended victim, not an incidental victim. He makes this argument only in connection with count 17, which focused on the killing of Gines, by pointing out that Gines was not a member of the rival organization with which Concepcion had a dispute and arguing that there was "no testimony that appellant intended to shoot Gines in order to further or maintain his position in the alleged enterprise." (Concepcion brief on appeal at 54.) We reject the suggestion that the government must prove that the victim of the violence was the defendant's intended target.

The concept of transferred intent is well established in the criminal law, *see, e.g.*, *United States ex rel. Jackson v. Follette*, 462 F.2d 1041, 1047 n. 10 (2d Cir.) (quoting 4 W. Blackstone, *Commentaries* *199–200), *cert. denied*, 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 496 (1972). Thus, a defendant who planned to murder one person and, in so attempting, killed another is guilty of the murder of the unplanned victim. *See generally Yates v. Evatt*, —— U.S. ——, ——, 111 S.Ct. 1884, 1896, 114 L.Ed.2d 432 (1991). This concept is generally applicable to § 1959's predicate crimes, and Concepcion has presented us with no reason to believe that Congress intended it not to

apply to § 1959. In light of this traditional principle, together with the Congressional mandate that RICO be interpreted liberally and our inference that Congress did not mean § 1959 to be read in a narrow or grudging fashion, we reject Concepcion's contention that the government was required to prove that he set out to kill Gines in particular. It was sufficient for the government to prove that Concepcion, as a member of a RICO enterprise engaged in racketeering activity, set out to commit a proscribed act of violence in order to maintain or increase his position in the enterprise, and that, in the course of so doing, he committed that act against a person who got in his way.

### C. *Sufficiency of the Evidence on the § 1959 Counts*

Concepcion and Aponte also contend that in connection with counts 17, 19, and 28, the government failed to prove all of the elements of a § 1959 offense. A defendant who seeks reversal of his conviction on the ground of insufficiency of the evidence bears a heavy burden. *See, e.g., United States v. Esdaille,* 769 F.2d 104, 108 (2d Cir.), *cert. denied,* 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985). In reviewing his challenge, we must credit every inference that could have been drawn in the government's favor, *United States v. Jacobo,* 934 F.2d 411, 415 (2d Cir.1991); *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983), and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *United States v. Labat,* 905 F.2d 18, 22 (2d Cir.1990); *United States v. Buck,* 804 F.2d 239, 242 (2d Cir.1986). Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses. *United States v. Stratton,* 779 F.2d 820, 827–28 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986). The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). Concepcion and Aponte have not met their burdens.

### 1. Concepcion's Killing of Gines

 In addition to the incidental-victim argument rejected above, Concepcion argues that there was no evidence that the "problem" he went to Metropolitan Avenue to solve was drug related and hence no evidence that its resolution could have affected his position in the Organization. This argument has no merit.

Taken in the light most favorable to the government, the evidence showed that the Metropolitan Avenue gunfight was a matter of Organization business. Pomales testified that on a May 1988 day that he recalled with clarity because he had just been released from the hospital, he went to Concepcion's garage and found there Concepcion and coconspirator Kenny Colon. Pomales testified that Colon, whose job was to bring in the proceeds of narcotics sales, said he was there because one of their sellers "had a problem with somebody and didn't want him in the certain spot." Though Pomales testified that he did not know what was meant by "spot," other coconspirator witnesses consistently referred to their "spot[s]" as the locations at which they would sell the Organization's narcotics. Pomales testified that Concepcion's response to Colon's report of a challenge for control of the "spot" was, "[S]o let's go and take care of it." Concepcion and several of his men promptly went to Metropolitan Avenue, where Concepcion initiated the shootout. Another witness testified that one of Concepcion's targets in the shootout was a person she had previously seen selling narcotics at or near that location. When Melendez later told Concepcion "he was stupid because the money he was making, he could pay somebody to take care of his business, not do it himself," Concepcion, who was then still a lieutenant in the Organization, responded, "I'm that type of guy, I like to take care of my own actions." This was ample evidence from which a rational juror could infer

beyond a reasonable doubt that Concepcion initiated the violence at Metropolitan Avenue in connection with the Organization's narcotics business, and that he did so in order to maintain and improve his leadership position within the Organization.

### 2. The Assaults on Ortiz and Reyes

Concepcion's conviction on count 19, which alleged assaults on Ortiz and Reyes for the purpose of maintaining or increasing Concepcion's position in the Organization, raises other questions. Ortiz and Reyes were injured during the Metropolitan Avenue gunfight in which Gines was killed. Though there was abundant evidence that Concepcion himself shot Gines, the government concedes that there was no evidence establishing precisely who shot Ortiz or Reyes. The district court instructed the jury that with respect to this charge it could find Concepcion guilty of violating § 1959 by applying 18 U.S.C. § 2. Concepcion argues that because the government was unable to identify the actual shooter or shooters, it did not prove that Concepcion aided and abetted the commission of a § 1959 offense in violation of § 2(a). The government argues that Concepcion's conviction on this count may be upheld on the theory that the jury found that he "cause[d]" the assaults on Ortiz and Reyes in violation of § 2(b). We agree with the government.

■ Section 2 of 18 U.S.C., which the trial court read to the jury in its entirety, states as follows:

§ 2. Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

To secure a conviction on a theory of aiding and abetting in violation of subsection (a), the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required the defendant to act, with the specific purpose of bringing about the underlying crime. *United States v. Labat*, 905 F.2d at 23. Under § 2(a), "an aider and abetter must share in the principal's essential criminal intent, [and] 'the principal must be shown to have had the "essential criminal intent." ' " *United States v. Elusma*, 849 F.2d 76, 78 (2d Cir.1988) (quoting *United States v. Tashjian*, 660 F.2d 829, 842 (1st Cir.), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981)), *cert. denied*, 489 U.S. 1097, 109 S.Ct. 1570, 103 L.Ed.2d 936 (1989).

We agree with Concepcion that his conviction on count 19 cannot be sustained on the basis of aiding and abetting under § 2(a) because there is no evidence as to who fired the shots that injured Ortiz and Reyes. Since the identity of that person or persons was not shown, there was no basis on which the jury could rationally infer that the shooter(s) had the criminal intent to violate § 1959 envisioned by § 2(a).

■ The requirements of § 2(b), however, are somewhat different. Whereas § 2(a) speaks in terms of procuring or aiding and abetting the commission of an "offense," and hence requires proof that the primary actor had criminal intent, § 2(b) speaks in terms of causing the actor to perform only an "act." This subsection was added to § 2 in 1948 in order to

make[ ] clear the legislative intent to punish as a principal *not only* one who directly commits an offense and *one who "aids, abets*, counsels, commands, induces or procures" another to commit an offense, *but also anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States*.

It removes all doubt that one who puts in motion ... or causes the commission of an indispensable element of the offense by an *innocent* agent or instrumentality, is guilty as a principal....

18 U.S.C. § 2 Historical and Revision Notes (emphasis added). Thus, § 2(b) adopts the "general principal of causation in criminal

law that an individual (with the necessary intent) may be held liable if he is a cause in fact of the criminal violation, even though the result which the law condemns is achieved through the actions of innocent intermediaries." *United States v. Kelner*, 534 F.2d 1020, 1022 (2d Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976); *see, e.g., United States v. Jordan*, 927 F.2d 53, 55 (2d Cir.) (defendant liable for causing other party to import heroin into United States), *cert. denied*, — U.S. —, 111 S.Ct. 2811, 115 L.Ed.2d 983 (1991); *United States v. Heyman*, 794 F.2d 788, 791 (2d Cir.) (defendant liable for causing brokerage house to fail to file currency transaction reports), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986); *United States v. Margiotta*, 688 F.2d 108, 131 (2d Cir.1982) (defendant liable for causing public officials to commit extortion under color of official right), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). Accordingly, the person who actually performed the act need not have had any criminal purpose or intent; if the defendant willfully caused an act that, had he performed it directly, would be an offense against the United States, he may be prosecuted under § 2(b) "even though the agent who committed the act is innocent or acquitted." *United States v. Ruffin*, 613 F.2d 408, 412 (2d Cir.1979).

Applying the willful "cause in fact" standard in the present case, there can be no question that there was sufficient evidence for the jury to find Concepcion guilty as a principal under § 2(b) for assaulting Ortiz and Reyes for the purpose of maintaining or increasing his position within the Organization. Concepcion went to the location in question to protect the Organization's retail sales spot and provided leadership in that endeavor. Once there, he initiated the gun battle by shooting Gines several times and then turning and firing at others. Rival drug dealers returned his fire, and Concepcion continued shooting until his gun jammed. If the wounds to Ortiz and Reyes were not inflicted by Concepcion himself, they most certainly were inflicted by other participants in the gun battle, which had been set in motion by Concepcion's own willful actions. Accordingly, the jury was entitled to find Concepcion guilty on count 19 under § 2(b).

### 3. Aponte's Killing of Robert

Aponte argues that the government failed to prove that his killing of Robert was for the purpose of maintaining or increasing Aponte's position in the Organization because, he contends, there was insufficient evidence that Aponte was then a member of the Organization rather than simply an independent contractor. The record, viewed in the light most favorable to the government, does not support his contention.

■ In passing, we note that § 1959 as a whole is sufficiently inclusive to encompass the actions of a so-called independent contractor, for it reaches not only those who seek to maintain or increase their positions within a RICO enterprise, but also those who perform violent crimes "as consideration for the receipt of ... anything of pecuniary value" from such an enterprise. The evidence at trial included proof that, for killing Robert, Aponte received a diamond Rolex watch and $10,000. Hence, even as an independent contractor he could have been prosecuted for a violation of the clause of § 1959 quoted here. However, the indictment alleged only that Aponte had sought to maintain or increase his position in the Organization, and we are therefore constrained by those allegations. *See, e.g., Dunn v. United States*, 442 U.S. 100, 106, 99 S.Ct. 2190, 2194, 60 L.Ed.2d 743 (1979) ("To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process.").

■ In any event, we reject the contention that the evidence was not sufficient to show that Aponte, when he killed Robert on February 23, 1989, was a member of the Organization. The record included the trial testimony of accomplice Vincent Hernandez, who had been recruited into the Organization by defendant Fernando Alvarez, one of its "street bosses" and enforcers. Prior to February 2, 1989, Alvarez, an Or-

ganization member since at least 1988, introduced Hernandez to Aponte and described Aponte as Alvarez's "boss." That description was supported by the testimony of Pomales that Alvarez was the driver of Aponte's getaway car when Aponte killed Robert.

### D. *The Sentencing of Frias*

During the phase of the investigation that followed the March 1989 arrests of Concepcion and Aponte, the authorities learned that the Organization ran a heroin cutting operation in Frias's apartment at 608 West 189th Street in Manhattan. They obtained a warrant for Frias's arrest and a search warrant for the apartment. As officers sought to execute the search warrant on August 22, 1989, a semi-automatic sawed-off rifle and a semi-automatic pistol were thrown from one of the apartment's windows and were recovered by officers posted outside. Inside the apartment, Frias and a co-defendant were arrested; trace amounts of heroin were found; and numerous items, including paraphernalia used to manufacture and package narcotics, were seized. Three other men, including two Organization members who were tried below with these appellants and whose appeals have been disposed of by summary order, were apprehended as they tried to escape.

The indictment charged Frias with conspiring with other Organization members to distribute and to possess with intent to distribute narcotics, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846; using a firearm in relation to a narcotics trafficking crime, in violation of 18 U.S.C. § 924(c); possessing an unregistered firearm, in violation of 26 U.S.C. § 5861(d); and possessing firearms as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The jury acquitted Frias on the two narcotics-related counts and convicted him on the two firearms counts.

The Presentence Report ("PSR") prepared on Frias, using the 1988 version of the Guidelines because that version was in effect at the time of his offenses and the version in effect at the time of his sentencing could have created an *ex post facto* problem, *see United States v. Adeniyi*, 912 F.2d 615, 618 (2d Cir.1990), calculated that Frias's base offense level was 36. Though the Guidelines provided a lower base offense level for weapons offenses not committed in connection with any other crime, the basis for the PSR calculation was that Frias had possessed his weapons in connection with the Organization's narcotics operations and that his participation in that conspiracy required use of the higher base offense level pursuant to Guidelines §§ 2K2.1(c)(1), 2K2.2(c)(1), § 2X1.1, and § 2D1.1. In addition, the PSR concluded that the offense level should be adjusted upward by two steps pursuant to Guidelines § 2D1.1(b)(1) on the ground that Frias had possessed his firearms during the commission of the drug offense, yielding an adjusted offense level of 38. Given that offense level and Frias's criminal history category of II, the range of imprisonment prescribed by the Guidelines was 262 to 327 months. The PSR noted, however, that because the statutory maximum prison term for each count on which Frias was convicted was 10 years, the maximum to which he could be sentenced was 120 months on each count, to be served consecutively, for a total of 240 months.

Frias objected to the PSR calculation, arguing principally that his sentence could not properly be calculated on the basis of conduct of which the jury had acquitted him. The district court rejected his contentions and accepted the recommendations of the PSR. The court stated that the government had shown by a preponderance of the evidence that Frias had

> used the firearms in connection with—
> the firearms at issue for which he was
> convicted in connection with the commission of conspiracy to distribute narcotics
> in the unknown organization conspiracy
> and the firearms were possessed during
> the commission of the conspiracy and
> used in connection with the conspiracy
> and directly related to the conspiracy.

(June 28, 1991 Transcript of Hearing on Sentencing of Frias at 14–15.) The court went on to find that Frias's involvement in the Organization's "major massive drug

conspiracy" had been established by "clear and convincing proof, above preponderance" (*id.* at 17), and it decided to sentence Frias to the statutory maximum, two consecutive 10–year prison terms.

On appeal, Frias contends (a) that the increases in offense level were not authorized by the Guidelines and violated his right to due process; (b) that increasing his offense level on the basis of conduct for which he had been acquitted violated his right to be free from double jeopardy; and (c) that making his sentences consecutive rather than concurrent violated his right to be free from double jeopardy.

### 1. Base Offense Level of 36 Under the Guidelines

Frias contends that the base offense level for the offenses of which he was convicted should have been at most 16, which carried an imprisonment range of 24–30 months. He argues that the federal Sentencing Commission ("Commission") could not have intended to require the much higher base offense level of 36, and ensuing adjustment to 38 for which the imprisonment range was 262–327 months, on the basis of conduct of which he had been acquitted. We conclude that the district court properly interpreted the Guidelines as directing the calculation of the base offense level with reference to Frias's acquitted conduct, but we also conclude that the court should consider whether the outcome of that calculation in the present case warrants a downward departure.

■■■ Under the 1988 Guidelines, a conviction under § 922(g)(1) for possession of firearms by a person previously convicted of a felony was governed by § 2K2.1; a conviction under § 5861(d) for possession of unregistered firearms was governed by § 2K2.2. *Compare* 1988 Guidelines §§ 2K2.1, 2K2.2 *with* 1989 Guidelines §§ 2K2.1, 2K2.2 (eff. Nov. 1, 1989) (placing most weapons possession offenses under § 2K2.1) *and* 1990 Guidelines §§ 2K2.1, 2K2.2 (eff. Nov. 1, 1990) (same) *and* 1991 Guidelines § 2K2.1 (eff. Nov. 1, 1991) (adding most weapons trafficking offenses to § 2K2.1). For Frias's § 922(g)(1) convic-

tion, § 2K2.1(a) of the 1988 Guidelines set a base offense level of 9; for his § 5861 conviction, § 2K2.2(a) set a base offense level of 12. These offense levels were only conditional, however, for each section contained a cross-reference requiring the court to apply a different guideline if the firearm had been used in connection with another offense that carried a higher offense level:

> [i]f the defendant used the firearm in committing or attempting another offense, apply the guideline in respect to such other offense, or § 2X1.1 (Attempt or Conspiracy) if the resulting offense level is higher than that determined above.

1988 Guidelines § 2K2.1(c)(1); *see id.* § 2K2.2(c)(1) (substituting "for" for "in respect to", and moving second comma to follow parenthetical). Here, the court was persuaded by at least a preponderance of the evidence that Frias had used his firearms in connection with the Organization's narcotics conspiracy. It was required, therefore, to turn to § 2X1.1.

Section 2X1.1 set as the base offense level for conspiracy "*[t]he base offense level from the guideline for the object offense,* plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." 1988 Guidelines § 2X1.1(a) (emphasis added). Since the object of the Organization's conspiracy was distribution of narcotics, the court was required to look to Guidelines § 2D1.1. That section required that narcotics traffickers be sentenced in relation to the quantity of narcotics involved in the offense, *see* 1988 Guidelines § 2D1.1(a)(3), as set forth in the Drug Quantity Table following § 2D1.1. Since the evidence showed that the Organization had distributed more than 10 kilograms of heroin, that Table required a base offense level of 36.

In *United States v. Patterson,* 947 F.2d 635 (2d Cir.1991), this Court held that under the comparable cross-reference provision found in § 2K2.1(c)(2) of the 1990 Guidelines, the base offense level for a defendant convicted of both firearms and narcotics offenses was properly calculated

as if the weapons offense were a drug offense because the latter carried the higher penalty. *See id.* at 636 (when "evidence show[s] that the gun was possessed in connection with an attempted drug transaction" and "the object offense carries a higher offense level than that provided for the gun offense," "the Guidelines explicitly refer the sentencing court to the guideline for the offense committed or attempted"). *Patterson*, however, did not deal with the question of whether such an increase was intended when the defendant was not convicted of both weapons and narcotics offenses.

The cross-references in the weapons sections of the 1988 Guidelines, quoted above, referred simply to committing "another offense," without specifying whether that offense was to be an offense of which the defendant was convicted. We think it plain, however, that there was no intent to require a conviction, for the commentary accompanying § 2K2.1 indicates that the Commission did not mean its reference to be limited to offenses with which the defendant was charged. It stated that

> [t]he firearm statutes often are used as a device to enable the federal court to exercise jurisdiction over *offenses that otherwise could be prosecuted only under state law.* For example, a convicted felon may be prosecuted for possessing a firearm if he used the firearm to rob a gasoline station. Such prosecutions result in high sentences because of the true nature of the underlying conduct. *The cross reference at § 2K2.1(c)(1) deals with such cases.*

1988 Guidelines § 2K2.1 Background (emphasis added). Since the Commission intended "another offense" to include an offense that could not be prosecuted in federal court, it obviously meant that term to include conduct with which the defendant was not charged. *Accord United States v. Humphries*, 961 F.2d 1421, 1422 (9th Cir. 1992) (per curiam) (Commission intended "to allow the continuation of the practice of extending federal jurisdiction over otherwise unreachable underlying conduct"); *United States v. Harris*, 932 F.2d 1529, 1537 (5th Cir.) (no error in sentencing de-

fendant under the guideline for murder when calculating defendant's sentence for firearms offense even though defendant was not charged with murder), *cert. denied,* —— U.S. ——, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991); *United States v. Willis*, 925 F.2d 359, 361 (10th Cir.1991) ("the cross reference ... requires that when a defendant uses an illegal firearm to commit other offense conduct [aggravated assault] that he be sentenced according to such other offense conduct even though his conviction is only for the unlawful possession of firearms"); *United States v. Madewell*, 917 F.2d 301, 306 (7th Cir.1990) (same). Thus, in *United States v. Bronaugh*, 895 F.2d 247 (6th Cir.1990), the Sixth Circuit ruled that a defendant charged with and convicted of only a firearms offense was properly sentenced to the statutory maximum prison term of five years, rather than the 6–12–month range conditionally prescribed by 1988 Guidelines § 2K2.1(a) for his offense of conviction, because the district court found it established by a preponderance of the evidence that he had used the weapon in drug trafficking. The court of appeals noted that the cross-reference in that section led to a higher offense level, resulting in a prescribed imprisonment range of 262–327 months though the defendant had not been charged with drug trafficking. It ruled that the "five-fold increase in his sentence because a preponderance of the evidence indicates he is guilty of an uncharged crime" was intended by the Commission and was within the authority granted by Congress. *Id.* at 251.

■ Given the Commission's evident intent that the term "another offense" include uncharged offenses, we are left with the question of whether it also meant that term to include an offense with which the defendant was charged but of which he was acquitted. We conclude that it did. It had been established long before the advent of the Guidelines that the sentencing court could properly take into account any information known to it, *see, e.g., Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949), so long as the defendant had an opportunity to re-

spond in order that the court not rely on misinformation, *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948). Since an "[a]cquittal d[id] not have the effect of conclusively establishing the untruth of all the evidence introduced against [a] defendant," *United States v. Sweig*, 454 F.2d 181, 184 (2d Cir.1972), and since disputed facts for purposes of sentencing needed only to be established by a preponderance of the evidence, *see, e.g., United States v. Lee*, 818 F.2d 1052, 1057 (2d Cir.), *cert. denied*, 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987), the sentencing court was entitled to consider information that the defendant had engaged in conduct that was the subject of an acquittal, *United States v. Roland*, 748 F.2d 1321, 1327 (2d Cir.1984); *United States v. Sweig*, 454 F.2d at 183.

█ We have ruled that the adoption of the Guidelines has not changed these basic principles. Thus, disputed facts relevant to sentencing, even under the Guidelines, need be established only by a preponderance of the evidence. *See, e.g., United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 182 (2d Cir.), *cert. denied*, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Cousineau*, 929 F.2d 64, 67 (2d Cir.1991); *United States v. Shoulberg*, 895 F.2d 882, 886–87 (2d Cir.1990); *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.1989) (preponderance standard applicable to calculation of offense level based on defendant's possession of uncharged narcotics), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990); *see also United States v. Restrepo*, 946 F.2d 654, 655–56 (9th Cir.1991) (en banc) (collecting cases), *cert. denied*, —— U.S. ——, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992). And the sentencing court remains entitled to rely on any type of information known to it. *See, e.g., United States v. Carmona*, 873 F.2d 569, 574 (2d Cir.1989) (use of testimony from trial in which defendant was not a defendant or represented by counsel); *United States v. Alexander*, 860 F.2d 508, 512–13 (2d Cir.1988) (use of grand jury testimony); *see also* 1988 Guidelines § 1B1.3 Background ("Relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for [such] offenses.").

Accordingly, in *United States v. Rodriguez–Gonzalez*, in which a defendant had been convicted of narcotics trafficking but acquitted of possessing a firearm in connection with that trafficking, we upheld the district court's upward adjustment of his base offense level by two steps based on the offense characteristic of possessing a firearm during the commission of narcotics offense. 899 F.2d at 182; *cf. United States v. Moreno*, 933 F.2d 362, 374 (6th Cir.) (upholding sentencing court's consideration of quantities of drugs dealt in by conspiracy, where defendant was convicted of attempting to possess 500 or more grams of cocaine but acquitted of conspiracy), *cert. denied*, —— U.S. ——, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991).

Frias seeks to distinguish *Rodriguez–Gonzalez* on the basis that there the sentencing court used the acquitted conduct merely to adjust a base offense level upward by a relatively small increment, not to set a high base offense level initially. We think any suggestion that the Commission did not intend to prescribe a high base offense level in circumstances such as those here, or that the Guidelines are ambiguous in this regard, is belied by the commentary to § 2K2.1, quoted above, which explained that the cross-reference to the higher base offense levels for other crimes was a recognition that prosecutions under the federal firearm statutes often "result in high sentences because of the true nature of the underlying conduct." 1988 Guidelines § 2K2.1 Background. All later versions of the Guidelines have included the same cross-reference, *see* 1992 Guidelines § 2K2.1(c)(1)(A); *id.* Application Note 14; 1991 Guidelines § 2K2.1(c)(1)(A); *id.* Application Note 14; 1990 Guidelines § 2K2.1(c)(2), and the 1990 Guidelines made the same observation, *see id.* Background.

We conclude that, in light of the court's findings that Frias possessed his guns in connection with the Organization's conspiracy to distribute more than 10 kilograms of

narcotics, the applicable guideline established a base offense level of 36.

█ Nonetheless, both the Guidelines and the Sentencing Reform Act provide that the "sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, *or to a degree,* not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" Guidelines § 5K2.0 (quoting 18 U.S.C. § 3553(b) (1988) (emphasis added)). Although the above discussion reveals that the Commission envisioned some increase in offense level based on conduct of which the defendant had been acquitted, it is questionable whether it envisioned an increase to the degree that occurred here. The example given in the Background commentary to 1988 Guidelines § 2K2.1 does not indicate that the Commission intended the cross-reference, to a guideline for conduct of which the defendant was not convicted, to result in so large an increase.

In stating that the cross-reference provided by § 2K2.1(c)(1) could "result in high sentences because of the true nature of the underlying conduct," the commentary provided as an illustration "a convicted felon ... prosecuted for possessing a firearm if he used the firearm to rob a gasoline station." 1988 Guidelines § 2K2.1 Background. The base offense level for possession of that firearm under the 1988 Guidelines would have been 9; application of the cross-reference to the 1988 guideline for robbery would have resulted in a base offense level of 18, *see* 1988 Guidelines § 2B3.1(a), an increase of nine levels. Assuming a defendant, such as Frias, with a Criminal History Category of II, the sentence would have been increased from 6–12 months to 30–37 months; instead of a possible prison term of just six months, the hypothetical defendant could have been sentenced to more than three years. Such an increased sentence would aptly be termed "high."

On the other hand, an increase from one year to 22 years would more aptly be termed astronomical. In the present case, application of the cross-reference provision raised Frias's base offense level from 12 to 36, increasing the prescribed imprisonment range from 12–18 months to 210–262 months. Thus, instead of being imprisoned for perhaps as little as one year, he could, in theory, have been sentenced to imprisonment for nearly 22 years. If the Commission had intended that conduct of which the defendant was acquitted could lead to a sentence of nearly 22 years instead of one-to-three years, we doubt that it would have chosen the relatively mild term "high."

In sum, though we agree with the district court that application of the cross-reference provisions of the Guidelines resulted in a base offense level of 36, we doubt that, with respect to conduct of which the defendant was acquitted, the Commission intended so extreme an increase. We therefore conclude that the district court had the power to depart downward pursuant to Guidelines § 5K2.0. Since the court apparently did not consider whether such a departure was permissible, we vacate Frias's sentence and remand the matter to permit the court to consider whether or not to depart from the offense level arrived at through strict application of the Guidelines.

### 2. Adjusted Offense Level of 38

█ In addition, we have difficulty with the PSR's final upward adjustment of offense level from 36 to 38 pursuant to Guidelines § 2D1.1(b)(1) on the ground that, in connection with the narcotics conspiracy, Frias possessed weapons. Though *United States v. Patterson,* 947 F.2d 635, might appear at first blush to sanction this increase, we conclude that it does not. In *Patterson,* the defendant had been convicted of three narcotics offenses and a firearms offense, the latter arising out of the narcotics activity. Pursuant to 1990 Guidelines § 3D1.2 the sentencing court grouped the gun conviction with the three narcotics convictions in order to determine the base offense level; it then made a two-level upward adjustment for possession of the gun. We approved the sentence, stating that although "[s]uperficially, this is arguably double-counting," "not all double-counting is prohibited." *Id.* at 637. We can see the validity of adding a weapons-use increase where, as in *Patterson,* the weapons conviction carried a lower offense level than the narcotics convictions, and the former was subsumed in the latter for purposes of grouping at the higher level. But in the present case, the final increase brings the

calculation full circle. Frias was convicted only of weapons offenses; they were not "grouped" with narcotics offenses, because there were no narcotics convictions. The narcotics base offense level entered the picture here only through the cross-references designed to ensure that the offense level for the weapons offenses adequately reflected the seriousness of the weapons offenses. To add to the narcotics offense level, chosen only to reflect the circumstances of the weapons offenses, an increment for possessing weapons is tantamount to adding an increase on the basis that the defendant possessed weapons in the course of possessing weapons. This constitutes impermissible double-counting, and we cannot conclude that the Guidelines authorized it.

Accordingly, we conclude that Frias's total offense level under the Guidelines should not have been more than 36. Thus, even if the district court decides not to depart downward from level 36 as discussed in the previous section, it should reconsider the sentence to be imposed on Frias, using a base offense level of 36 rather than 38.

### 3. The Constitutional Challenges

Frias argues that even if the Guidelines authorized calculation of his base offense level with respect to acquitted conduct, punishment for conduct not proven beyond a reasonable doubt violated his right to due process, and punishment for conduct of which he was acquitted violated his right to be free from double jeopardy. He also contends that his right to be free from double jeopardy was violated by the imposition of consecutive sentences for offenses involving the same firearms. We disagree.

#### a. *Due Process*

■■■ As indicated above, we have held that disputed facts relating solely to sentencing need be proven only by a preponderance of the evidence, and that a defendant's right to due process is not violated by the calculation of his sentence with reference to facts proven only under that standard and not proven under the higher reasonable-doubt standard that is applicable at trial. *See, e.g., United States v. Rodriguez–Gonzalez,* 899 F.2d at 182; *United States v. Weinberg,* 852 F.2d 681, 685 (2d Cir.1988); *United States v. Lee,* 818 F.2d at 1057; *see also McMillan v.*

*Pennsylvania,* 477 U.S. 79, 91–93, 106 S.Ct. 2411, 2418–20, 91 L.Ed.2d 67 (1986) (due process does not require application of a standard of proof greater than preponderance in state sentencing proceedings); *United States v. Isom,* 886 F.2d 736, 738 (4th Cir.1989) (enhancement of sentence based on acquitted conduct does not violate due process because "[a] verdict of acquittal demonstrates only a lack of proof beyond a reasonable doubt; it does not necessarily establish the defendant's innocence").

Frias argues that use of the preponderance standard here violates due process because application of the cross-reference provision resulted in a 22–step increase in his offense level. *See United States v. Kikumura,* 918 F.2d 1084, 1100–01 (3d Cir. 1990) (at least clear and convincing evidence required to support findings resulting in 22–level upward departure); *cf. United States v. Townley,* 929 F.2d 365, 370 (8th Cir.1991). Whatever the merits of this contention, *compare, e.g., United States v. Kikumura,* 918 F.2d at 1100–01, *and United States v. Townley,* 929 F.2d at 370, *and* Note, *The Federal Sentencing Guidelines: Adopting Clear and Convincing Evidence as the Burden of Proof,* 57 U.Chi.L.Rev. 1387 (1990), *with, e.g., United States v. Salmon,* 948 F.2d 776, 778–79 (D.C.Cir.1991) ("government bears the burden of proving by a preponderance of the evidence any facts that would enhance a defendant's sentence"), *and United States v. Restrepo,* 946 F.2d at 661 ("due process does not require a higher standard of proof than preponderance of the evidence to protect a convicted defendant's liberty interest in the accurate application of the Guidelines"), *and United States v. Rodriguez–Gonzalez,* 899 F.2d at 182 ("adoption of the Guidelines has not changed the principle that disputed sentencing factors need only be proved by a preponderance of the evidence to satisfy due process"), we need not address it here. The district court found that the government had established Frias's use of the guns in connection with the conspiracy by "clear and convincing proof." Thus, even if we were to agree with Frias that due process required that that standard be employed in such situations, that standard would not afford Frias a basis for relief.

#### b. *Double Jeopardy*

■■■ We have also recognized that though in imposing sentence the district

court may take into account conduct that was not the basis for conviction, the punishment imposed is "for" the offense of conviction, not for the other conduct:

> In considering the acquitted conduct as a basis for enhancing [the defendant's] sentence, the district court "was not relying on facts disclosed at trial to punish the defendant for the extraneous offense, but to justify the heavier penalties for the offenses for which he was convicted."

*United States v. Rodriguez-Gonzalez*, 899 F.2d at 181 (quoting *United States v. Juarez-Ortega*, 866 F.2d 747, 749 (5th Cir. 1989) (per curiam)). The penalty imposed cannot exceed the statutory maximum for the offense of conviction, if, as here, the statutory maximum for the other relevant conduct is higher. Thus, the reference to acquitted conduct as a basis for enhancing the punishment to be meted out for the offense of conviction does not violate the defendant's right to be free from double jeopardy. *United States v. Sweig*, 454 F.2d at 184; *cf. United States v. Funt*, 896 F.2d 1288, 1300 (11th Cir.1990) (court may consider injury to victims of conduct shown in connection with counts on which defendant was acquitted); *United States v. Atkins*, 480 F.2d 1223, 1224 (9th Cir.1973) (per curiam) (court may consider information relating to count reversed on appeal); *United States v. Needles*, 472 F.2d 652, 655 (2d Cir.1973) (court may consider information relating to dismissed counts); *United States v. Doyle*, 348 F.2d 715, 721 (2d Cir.) (same), *cert. denied*, 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965); *Billiteri v. United States Board of Parole*, 541 F.2d 938, 944–45 (2d Cir.1976) (parole board entitled to consider information relating to dismissed counts).

Finally, a single transaction may give rise to liability for distinct offenses under separate statutes without violating the Double Jeopardy Clause if the legislature so intended. *Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981) ("Where Congress intended ... to impose multiple punishments, imposition of such sentences does not violate the Constitution."). There is no question that the offenses of possession of unregistered weapon, in violation of 26 U.S.C. § 5861(d), and possession of a weapon as a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1), are distinct offenses, each including at least one element that the other does not, *see Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *cf. United States v. Lawrence*, 928 F.2d 36, 39 (2d Cir.1991) (no double jeopardy violation in cumulative punishment for violations of § 922(g)(1) (possession of gun by felon) and § 924(c) (use of gun in relation to narcotics trafficking)), and there is no indication here that Congress intended that a defendant convicted of both a § 922(g)(1) offense and a § 5861(d) offense not be punished cumulatively for both.

### E. *Other Challenges to the Convictions*

Defendants' other arguments include (1) Concepcion's contentions that the district court erred in permitting the government to change its theory on count 17, in limiting his cross-examination of a government informant, and in allowing that witness to testify that Concepcion had offered to commit a murder; and (2) Frias's contention that he was unduly prejudiced by the court's reading the indictment to the jury despite his agreement to a stipulation he had hoped would obviate such a reading. These contentions need not detain us long.

#### 1. Limitation on Cross–Examination

Concepcion complains that the district court improperly precluded him from cross-examining government informant Victor Jimenez about a murder Concepcion contends Jimenez committed but failed to disclose to the government. We find no basis for reversal.

"The scope and extent of cross-examination lies within the discretion of the trial judge." *United States v. Blanco*, 861 F.2d 773, 781 (2d Cir.1988), *cert. denied*, 489 U.S. 1019, 109 S.Ct. 1139, 103 L.Ed.2d 200 (1989). The trial court may, in its discretion, preclude questions for which the questioner cannot show a good faith basis. *United States v. Katsougrakis*, 715 F.2d 769, 778–79 (2d Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). So long as the jury has before it sufficient information to make a discriminating appraisal of the witness's possible motives for testifying falsely in favor of the government, we will uphold the trial court's exercise of its discretion. *United States v. Singh*, 628 F.2d 758, 763 (2d Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980); *see also United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir.1990); *United States v. Tillem*, 906

F.2d 814, 827 (2d Cir.1990). We see no abuse of discretion here.

The district court refused to allow Concepcion to inquire into the alleged murder in part on the ground that there was insufficient evidence that such a murder had actually occurred or that it had been committed by Jimenez. The refusal was within the scope of the court's discretion. Concepcion's proffer on the matter consisted chiefly of hearsay statements made by unidentified sources. Further, his principal source identified the person who procured the alleged murder only by a nickname, not by the name Victor or Jimenez. Finally, there was no dearth of other material on which Jimenez could be cross-examined. He had confessed to several serious crimes, including the attempted murder of a New York City Police Officer, and the district court allowed a wide-ranging cross-examination into these and other matters.

In sum, the court's limitation on the cross-examination of Jimenez provides no reason for reversal.

### 2. Evidence of Concepcion's Offer To Kill Another

The district court allowed Jimenez to testify, over Concepcion's objection, that Concepcion had offered to arrange the murder of one of Jimenez's rivals. Concepcion contends that this evidence was inadmissible under Fed.R.Evid. 404(b) because it was designed to show his propensity for violence and because he was not given advance notice that the government would offer it. Again, we disagree.

Rule 404(b) bars the admission of a defendant's uncharged crimes to prove propensity to commit the crime charged. An act that is alleged to have been done in furtherance of the alleged conspiracy, however, is not an "other" act within the meaning of Rule 404(b); rather, it is part of the very act charged. See, e.g., United States v. Biaggi, 853 F.2d 89, 106 (2d Cir.1988), cert. denied, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); United States v. Angelilli, 660 F.2d 23, 39 (2d Cir.1981), cert. denied, 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982); United States v. Papadakis, 510 F.2d 287, 294–95 (2d Cir.), cert. denied, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). Further, when the other-act evidence is relevant to prove a material fact other than the defendant's propensity, it is not barred by Rule 404(b).

Here, there was an issue at trial as to whether or not Jimenez was a member of the alleged conspiracy with Concepcion. Evidence of conversations between Jimenez and Concepcion, and of the latter's offer to kill one of Jimenez's rivals was relevant to that issue. Further, Jimenez's testimony was admissible to show Concepcion's concern for the Organization's retail operations and the lengths to which Concepcion would go to defend them. See United States v. Bagaric, 706 F.2d at 64. Thus, the challenged testimony was admissible to prove material facts other than Concepcion's propensity to commit a crime and hence was not other-act evidence within the meaning of Rule 404(b).

Finally, even if the challenged testimony were properly deemed other-act evidence, Concepcion's lack-of-notice argument would lack merit. The recent amendment to Rule 404(b) requiring the government to give notice, if requested by the defendant, of its intent to use such evidence did not become effective until after the trial of the present case. The government thus was not required to give Concepcion advance notice of other-act evidence. See, e.g., United States v. Paccione, 949 F.2d 1183, 1199 (2d Cir.1991), cert. denied, — U.S. —, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992).

### 3. The Alleged Change in the Theory of Prosecution

In connection with Count 17, which charged Concepcion with causing the death of Gines in violation of §§ 1959 and 2, the government, in both its opening statement and its summation, argued that Concepcion himself killed Gines. In its summation, the government added that the jury could also find Concepcion guilty on an aiding and abetting theory. Concepcion contends that the government was "bound" by its opening statement and that the summation changed the government's theory of count 17, and thereby denied him a fair trial and an opportunity to defend against the aiding and abetting theory. These contentions are meritless.

By citing § 2, the indictment gave Concepcion notice that the government could proceed on the premise that he had violated § 1959 by aiding and abetting. See generally United States v. Miller, 471 U.S. 130, 134, 105 S.Ct. 1811, 1814, 85 L.Ed.2d 99 (1985) (no prejudice where defendant received "notice that [a particular] offense was charged and would need to be

defended against"). The government was not required to mention all possible theories in its opening. Concepcion's reliance on *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir.1984), for the proposition that the government was "bound" by its opening statement is misplaced. A party's statements of fact in its opening statement may indeed be used against it as admissions. Thus, in *McKeon*, factual statements in defense counsel's opening statement from the first trial of the case were admissible against the defendant at his second trial. Here, however, the government's opening made no factual concessions. The mere mention of one of the theories alleged in the indictment does not foreclose the presentation of evidence to support other theories, so long as the defendant has received adequate notice of those other theories.

In any event, Concepcion undoubtedly was not prejudiced by mention of the aiding and abetting theory in the government's summation since (a) the trial court refused to instruct the jury that it could find Concepcion guilty on count 17 on an aiding and abetting theory, and (b) the evidence that Concepcion himself had shot and killed Gines was abundant.

### 4. Frias's Stipulation as to Prior Convictions

Count 41 of the indictment, which charged Frias with possession of a firearm as a convicted felon, alleged that he had previously been convicted of attempted criminal possession of a weapon and criminal possession of a controlled substance. At trial, Frias sought to forestall the government's introduction of evidence concerning his prior convictions by stipulating that he had in fact been convicted of a felony prior to his arrest on the current charges. Frias contends that, in light of this stipulation, he was unfairly prejudiced by the trial court's disclosure to the jury of the indictment's allegations. For several reasons, his contention is meritless.

First, the stipulation itself did not require that the reference to the prior felonies be redacted from the indictment. Moreover, Frias did not object when the

court, during its instructions, read the unredacted indictment to the jury. Though he objected to the court's allowing the jury to have the unredacted indictment during its deliberations, the court instructed the jury that the indictment's allegations were not evidence of the prior convictions. We see no indication that Frias was unduly prejudiced.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and, except as indicated above, have found no basis for reversal. The judgments of conviction of Concepcion and Aponte are affirmed. Frias's conviction is affirmed; his sentence is vacated, and the matter is remanded for resentencing in a manner not inconsistent with the foregoing.

JON O. NEWMAN, Circuit Judge, concurring:

The sentencing of Nelson Frias is a stark example of the bizarre results that occasionally occur from a combination of the Sentencing Guidelines and the sentencing jurisprudence that was developed prior to the Guidelines and is now applied to the Guidelines regime. The key facts are: (1) Frias was charged with three offenses that affected his sentence—conspiracy to distribute heroin, possession of an unregistered firearm, and possession of a firearm by a convicted felon;[1] (2) he was acquitted of the heroin conspiracy and convicted of the two weapons offenses; (3) had he been *convicted* of all three offenses, his guideline range would have been 210 to 262 months or 17½ to 22 years; (4) though *acquitted* of the narcotics conspiracy, his guideline range is still 210 to 262 months or 17½ to 22 years; (5) had his sentence been based solely on the conduct of which he was convicted, his guideline range would have been 12 to 18 months or 1 to 1½ years; (6) he was sentenced to 20 years, the maximum under the two firearms counts (sentenced consecutively).

Judge Kearse's comprehensive opinion accepts, with a slight modification,[2] the

---

1. Frias was also charged with, and acquitted of, using a firearm in connection with a narcotics offense. Had he been convicted of this offense, his sentence would have been increased by a mandatory five-year consecutive sentence. *See* 18 U.S.C. § 924(c) (1988).

2. The District Court added a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a weapon in connection with a narcotics conspiracy, yielding an offense level of 38 and a guideline range of 262 to 327 months. The Court properly rules this adjustment to be dou-

guideline calculation of the District Court, but sensibly permits amelioration of the result by authorizing a downward departure. I concur in her opinion because the Guidelines and our prior construction of them oblige me to do so, but I think it worth amplifying the extraordinary course that the Sentencing Commission and our case law have set us on in the hope that some revision may receive serious consideration.

The guideline calculation in this case results from a combination of decisions, few, if any, of which have been made under any other system of guideline sentencing. *See* Michael Tonry, *Salvaging the Sentencing Guidelines in Seven Easy Steps*, 4 Fed. Sent.Rep. 355 (May–June 1992). First, the Commission decided to forgo the "offense of conviction" approach, under which sentences would be determined only with regard to conduct resulting in conviction. Instead the Commission adopted a system of "modified real offense sentencing," whereby "relevant conduct,"[3] whether or not resulting in conviction, would be considered in calculating sentences.

Second, the Commission followed that debatable but defensible decision with the entirely unjustified decision to price relevant conduct at exactly the same level of severity as convicted conduct. Though the Supreme Court had ruled, prior to the Guidelines, that a sentencing court may *consider* misconduct of a defendant, whether or not resulting in a conviction, *see Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949), it was an open policy choice for the Commission whether to price such conduct the same as convicted conduct or at some lesser level of severity. For example, the Commission could have decided that "relevant conduct" should be priced at one-half the severity of convicted conduct, or, in the sentencing judge's discretion, within a range of one-third to two-thirds of convicted conduct.

Third, the courts then had to decide what standard of proof to apply in determining whether the misconduct alleged to be relevant conduct had occurred. We have accepted the "preponderance of the evidence" standard, *see United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.1989), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990), although a strong argument can be made that the "clear and convincing evidence" standard should be used, at least for substantial enhancements, *see United States v. Kikumura*, 918 F.2d 1084, 1103 (3d Cir.1990). The "preponderance of the evidence" standard was originally made applicable to sentencing decisions in the pre-Guidelines regime. *See, e.g., United States v. Lee*, 818 F.2d 1052, 1057 (2d Cir.), *cert. denied*, 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987). It is highly questionable whether it should have been imported so readily into the Guidelines regime, particularly in light of the Commission's decision to price unconvicted conduct as severely as convicted conduct. The case for a higher standard is even stronger where, as here, the Guidelines require the "finding [of unconvicted conduct] to be a tail which wags the dog of the substantive offense [of conviction]." *See McMillan v. Pennsylvania*, 477 U.S. 79, 88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986). *See also United States v. Lee*, 818 F.2d at 1058 (Oakes, J., concurring) ("[W]e may very well want to hold at some future time in some other context that proof by clear and convincing evidence is required....").

Fourth, the courts then had to decide whether unconvicted conduct could be used to enhance a sentence even though the defendant had been acquitted of the alleged conduct. We have decided that acquitted conduct can be so used, *see United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 181–82 (2d Cir.), *cert. denied*, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990), and the Court today follows the inexorable logic of that decision even though the enhancement in *Rodriguez–Gonzalez* was two levels and the enhancement approved today is twenty-four levels. Again, the use of acquitted conduct to enhance a sentence came into our jurisprudence in the pre-Guidelines regime, *see United States v. Sweig*, 454 F.2d 181, 184 (2d Cir.1972), and it is highly questionable whether that technique belongs in a Guidelines regime. In

---

ble counting in the circumstances of this case, resulting in an offense level of 36 and a guideline range of 210 to 262 months.

**3.** The unconvicted conduct resulting in substantial enhancement of the guideline range in this case is not technically an application of section 1B1.3, the "relevant guideline" conduct, but rather of section 2K2.1(c), the cross-reference guideline for weapons offenses. My comments apply equally to enhancements under both sections, and it will simplify the discussion to refer to "relevant conduct."

*Sweig,* we merely approved a sentencing judge's opportunity to "consider" evidence of misconduct notwithstanding an acquittal. *Id.* Under the rigor of the current Guidelines, the sentencing judge is required to assess evidence of relevant misconduct, notwithstanding an acquittal, and, if persuaded by a preponderance of the evidence that such misconduct occurred, must enhance the sentence according to the same scale of severity that would have applied had the defendant been convicted of the misconduct.

The combined result of these developments for Nelson Frias is astonishing. Had he been convicted of the narcotics conspiracy offense, he would have faced a guideline range of 210 to 262 months and could have been sentenced at the top of the range to 262 months (nearly 22 years) since the maximum sentence for the drug conspiracy would have been life imprisonment. Having been acquitted of the drug conspiracy offense, he remains subject to the same guideline range of 210 to 262 months, and faces a maximum sentence of 20 years, which is the result of consecutive sentencing on the two weapons offenses. Thus, after he was tried for the conspiracy offense and acquitted, he faces virtually the same sentence that he would have received had he been convicted! His twenty-year sentence is thirteen times higher than the top of the guideline range that would have been applicable had he been sentenced solely for the conduct of which he was convicted. When the Guidelines and the case law implementing them permit such a result, it is high time for both the Commission and the courts to give serious reconsideration to the decisions that underlie this outcome.

For now, the only opportunity to ameliorate the guideline result is for the sentencing judge to give sympathetic consideration to the downward departure that the Court's opinion sensibly permits, since this surely is a case where a circumstance—enhancement of a sentence for acquitted conduct—is present "to a degree" not adequately considered by the Commission, 18 U.S.C. § 3553(b) (1988). In light of our precedents, I concur.

Order on Denial of Rehearing
and Rehearing In Banc.

March 25, 1993.

A petition for rehearing containing a suggestion that the action be reheard in banc having been filed herein by counsel for the defendant-appellant Nelson Frias.

Upon consideration by the panel that decided the appeal, it is

Ordered that said petition for rehearing is DENIED.

It is further noted that the suggestion for rehearing in banc has been transmitted to the judges of the court in regular active service and to any other judge that heard the appeal and a poll of said judges having been taken, a majority of the court has voted not to reconsider the decision in banc. Judge Newman dissents from the denial of the rehearing in banc in a separate opinion.

JON O. NEWMAN, Circuit Judge, dissenting:

One of the bizarre aspects of the current Sentencing Guidelines regime is that a defendant can receive the same sentence whether he is convicted or acquitted. That phenomenon occurs when a defendant is charged with multiple counts. The pending case of Nelson Frias illustrates the problem.

Frias was convicted of two firearms violations and acquitted of a drug conspiracy violation. His applicable guideline range based solely on the convicted conduct would have been 12 to 18 months. His actual guideline range, based in part on the drug conspiracy of which he was acquitted, was 210 to 262 months. This is the same range that would have been applicable had he been convicted of the drug conspiracy.

I requested a vote on whether to rehear Frias's case in banc in order to afford this Circuit an opportunity to reexamine its case law on the permissible uses of acquitted conduct. Prior to the Guidelines, we had permitted a sentencing judge merely to "consider" evidence of misconduct notwithstanding an acquittal. *See United States v. Sweig,* 454 F.2d 181, 184 (2d Cir.1972). Soon after the Guidelines were adopted, we permitted a sentencing judge to rely on acquitted conduct to increase a guideline range by two levels. *See United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 181–82 (2d Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990). In Frias's case, we permitted acquitted conduct to increase a guideline range by twenty-four levels. Acquitted conduct was relied on to increase his sentence from 18 months to 20 years. I regret that my colleagues do not consider this extraordinary outcome to be

an appropriate occasion to reconsider our case law concerning the permissible uses of acquitted conduct at sentencing.

With the denial of rehearing in banc, only three avenues of redress remain. First, Frias's case could be selected for further consideration on petition for writ of certiorari to resolve a split among the circuits. *See United States v. Brady*, 928 F.2d 844, 850–52 (9th Cir.1991) (court may not "reconsider facts during sentencing that have been rejected by a jury's not guilty verdict"). Second, the Sentencing Commission could revise its approach to the permissible uses of acquitted conduct. The Commission has included in the current amendments circulated for public comment a proposal to prohibit sentencing judges from using acquitted conduct as relevant conduct to increase the base offense level but permitting such conduct to be used for an upward departure from the unadjusted offense level. *See* United States Sentencing Commission, *Proposed Guideline Amendments for Public Comment* (Amendment 1) Jan. 1993. Third, Congress could provide a legislative solution. In some way, the law must be modified. A just system of criminal sentencing cannot fail to distinguish between an allegation of conduct resulting in a conviction and an allegation of conduct resulting in an acquittal.

From the denial of rehearing in banc, I respectfully dissent.