UNITED STATES of America, Appellee,

v.

Samuel WEINBERG,
Defendant–Appellant.

No. 1017, Docket 87–1511.

United States Court of Appeals,
Second Circuit.

Argued April 21, 1988.

Decided July 21, 1988.

Jonny J. Frank, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. for E.D.N.Y., Emily Berger, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for appellee.

Alan R. Kaufman, New York City (Buchwald & Kaufman, New York City, on the brief), for defendant-appellant.

Before TIMBERS, MESKILL, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Samuel Weinberg appeals from a judgment of conviction entered in

the United States District Court for the Eastern District of New York, Joseph M. McLaughlin, *Judge*, following a plea of guilty to one count of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (1982). Weinberg was fined $25,000 and sentenced to a term of eight years in prison. In addition, pursuant to his plea bargain, Weinberg, *inter alia*, forfeited $150,000 and resigned his position as a judge of the New York City Civil Court. On appeal, Weinberg contends principally that the proceedings at the sentencing hearing violated his Fifth Amendment right to due process and his Sixth Amendment right to the effective assistance of counsel. For the reasons below, we affirm the judgment of conviction.

## I. BACKGROUND

Weinberg was named in a 16-count superseding indictment ("indictment") charging him with racketeering and mail fraud in connection with his ownership, management, and control of several real properties in New York City. Count 1 charged him with conducting a pattern of racketeering activity through the enterprise of his real estate business, in violation of 18 U.S.C. §§ 1962(c) and 2. That count charged several predicate acts of arson in violation of state law, mail fraud in violation of 18 U.S.C. §§ 1341 and 2 (1982), and extortion in violation of 18 U.S.C. §§ 1951 and 2 (1982). These acts included using fraudulent and extortionate means to cause elderly and other low-paying tenants to vacate their apartments so that Weinberg could lease their apartments to higher-paying tenants; defrauding the purchaser of one of his buildings (the "82nd Avenue building") by bribing the superintendent to misrepresent the condition of the building; causing arson and vandalism at two of his other buildings (the "Fulton Street" and "Hawthorne Street" buildings, respectively); and filing false insurance claims with respect to the resulting damage. Counts 2-15 charged Weinberg with substantive offenses of mail fraud in connection with the acts charged as predicates for the RICO count. Count 16 charged him with mail fraud in connection with a false personal injury claim.

Following 10 months of discovery and preliminary proceedings, Weinberg and the government entered into a plea bargain in which Weinberg agreed principally to (a) plead guilty to the RICO count, (b) forfeit $150,000, (c) resign his position as a Civil Court judge, and (d) forfeit his judicial pension. The government agreed to move for dismissal of counts 2-16. The agreement further provided as follows:

> The Government, prior to sentencing, will advise the sentencing court of the nature and extent of Samuel Weinberg's criminal activities. The Government, however, will make no specific recommendations with respect to sentencing, such matters being solely within the province of the sentencing court.

Following the entry of Weinberg's plea of guilty, the parties exchanged a number of letters and memoranda relating to sentencing. The government detailed the information it planned to give the court with regard to the nature and extent of Weinberg's activities; Weinberg disputed a number of the government's factual contentions and requested a hearing. The submissions disclosed that the government intended to rely in part on grand jury testimony and other hearsay statements of tenants of the 82nd Avenue building; it advised the court and defense counsel that if the defense wished to cross-examine any of the hearsay declarants, the government would attempt to produce them at the hearing. Weinberg's attorney did not request the production of any of the tenants; he identified three other witnesses he characterized as "vital," and those witnesses were produced at the hearing.

At the sentencing hearing, the government introduced the testimony of several witnesses, including former employees of Weinberg's business and a government agent who had interviewed numerous Weinberg tenants, and introduced the testimony these tenants had given to the grand jury. After hearing the evidence, described in greater detail in Part II.B.2. be-

low, the district court found that the government had proven eight of 19 disputed factual allegations by a preponderance of the evidence. The court found, *inter alia,* that Weinberg had arranged for two arsons at the Fulton Street building, had engaged in an ongoing scheme to charge unlawful rents to tenants in the 82nd Avenue building, had filed false eviction proceedings against tenants in that building, had encouraged alcoholics to loiter in the building and harass the tenants, had asked employees to arrange for tenants to be assaulted, and had asked an employee to arrange to have one elderly tenant raped.

In addition to the penalties provided for in the plea agreement, the court sentenced Weinberg to pay a $25,000 fine and to serve eight years in prison. This appeal followed.

## II. DISCUSSION

Weinberg's principal arguments on appeal are (1) that the sentencing court should have excluded hearsay evidence, (2) that it should have required the government to prove its factual contentions by more than a mere preponderance of the evidence, and (3) that the evidence was insufficient to meet even the preponderance standard. In addition, he contends that count 1 of the indictment was defective because it failed adequately to charge the existence of a RICO enterprise; that the court's refusal to allow his attorney to withdraw from the case denied Weinberg the effective assistance of counsel; and that the government's submissions at sentencing detailed his criminal activities with such ferocity that they constituted a recommendation of a heavy sentence, thereby violating the government's agreement not to make a sentencing recommendation. We have considered all of Weinberg's contentions on this appeal and have found them to be meritless.

### A. *The RICO Indictment*

■ Relying on *Bennett v. United States Trust Co.,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986), which held

that "under section 1962(c) a corporate entity may not be simultaneously the 'enterprise' and the 'person' who conducts the affairs of the enterprise through a pattern of racketeering activity," Weinberg challenges count 1 of the indictment on the ground that the alleged RICO enterprise was in fact Weinberg himself. The merits of this contention are not properly before us, however, for it constitutes a challenge to the factual sufficiency of the government's case and thus has been waived.

It is well settled that, in the absence of a court-approved reservation of issues for appeal, a plea of guilty waives all challenges to the prosecution except those relating to the court's jurisdiction to try the offense. *E.g., Hayle v. United States,* 815 F.2d 879, 881 (2d Cir.1987); *United States v. Sykes,* 697 F.2d 87, 89 (2d Cir.1983). "If the indictment alleges all of the statutory elements of a federal offense and the defendant's contention is that in fact certain of those elements are lacking, the challenge goes to the merits of the prosecution, not to the jurisdiction of the court . . . ." *Hayle v. United States,* 815 F.2d at 882.

Count 1 of the indictment described the alleged enterprise as follows:

> The defendant SAMUEL WEINBERG's ownership, management, control and holding of mortgages upon these real properties were sufficiently extensive and organized so as to constitute, in effect, a business entity. . . .
>
> . . . .
>
> At all times relevant to this Indictment, . . . Samuel Weinberg's Real Estate Business, also known as All Cash Realty, and also known as Queens Blvd. Realty, . . . constituted an "enterprise" within the meaning of Title 18, United States Code, Section 1961(4).

The indictment alleged that the business entity employed the services of several people on a full-time or part-time basis. Thus, as the district court ruled, *see* 656 F.Supp. 1020, 1024 (1987), the indictment plainly alleged as a RICO enterprise a business entity that was distinct from Weinberg himself. Weinberg's contention that he was "in fact" the described enterprise is an

argument that goes to the merits rather than to jurisdiction. There having been no reservation of the issue for appeal, the issue has been waived.

### B. The Conduct of the Sentencing Hearing

Weinberg contends that in conducting the sentencing hearing, the district court erred in applying a preponderance-of-the-evidence standard and in admitting hearsay statements of his tenants as to his efforts to defraud them. He also contends that, in any event, the evidence was insufficient to support the government's contentions on the disputed issues. We reject all of these contentions.

### 1. The Hearsay Evidence and the Standard of Proof

■ The procedural arguments need not detain us long. In McMillan v. Pennsylvania, 477 U.S. 79, 91–93, 106 S.Ct. 2411, 2419–21, 91 L.Ed.2d 67 (1986), the Supreme Court held that due process does not require application of a standard of proof greater than preponderance in state sentencing proceedings. We have followed McMillan in adopting the preponderance standard for federal sentencing proceedings. See United States v. Lee, 818 F.2d 1052, 1057 (2d Cir.), cert. denied, — U.S. —, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987). The district court thus applied the proper standard of proof.

■ Nor is there merit in the challenge to the use of hearsay evidence. It has long been established that hearsay evidence is admissible at a sentencing hearing. See Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). Even if the defendant challenges the hearsay portions of a presentence report, that evidence need not be disregarded if the government introduces corroborating evidence. See, e.g., United States v. Pugliese, 805 F.2d 1117, 1123 (2d Cir.1986). Here there was ample basis for the court to admit and consider the hearsay testimony now challenged by Weinberg.

Prior to the hearing, the government had revealed that it intended to rely on hearsay statements by certain of Weinberg's tenants, including grand jury testimony, and it stated that it would attempt to produce at the hearing any of those declarants desired by Weinberg. Weinberg did not, either in advance of the hearing or thereafter, request the presence of any of the tenants. Further, as indicated below, the hearsay evidence relied on by the government was corroborated by the live testimony of witnesses at the hearing. We conclude that the challenge to the admission of the hearsay evidence is baseless.

### 2. The Sufficiency of the Evidence

■ At the hearing, the government presented documentary evidence and the testimony of several witnesses to show that Weinberg had acted to commit arson, to defraud, inter alios, insurance companies and the tenants of his 82nd Avenue building, and to commit extortionate acts against the tenants.

With respect to the arsons and the insurance frauds, the government relied principally on the testimony of John McGhee, an employee of Weinberg. McGhee testified that, at Weinberg's request, he had set two fires at the Fulton Street building. Other evidence suggested that these fires had occurred as McGhee described them. Weinberg challenges the court's conclusion that he arranged for these two arsons, arguing that McGhee's testimony was not credible and pointing out that Weinberg had spent money on repairs to the building before each of the fires. It is, of course, within the province of the trier of fact to decide whether and to what extent a witness's testimony is credible, and to decide which of competing inferences to draw; we will not overturn its findings unless they are clearly erroneous. E.g., United States v. Lee, 818 F.2d at 1058. We find no clear error in the court's finding that Weinberg committed arson and mail fraud with respect to insurance claims.

With respect to the fraudulent acts toward the tenants of the 82nd Avenue building, the government introduced the testimony of several witnesses. A special agent of the Bureau of Alcohol, Tobacco

and Firearms testified that he had spoken with numerous tenants of the building who stated that they had received eviction notices although their rent had in fact been paid. Tenants who had received an eviction notice stated further that they had never received a demand for rent prior to the institution of eviction proceedings, though such a demand was required by New York law. The government introduced these tenants' grand jury testimony to the same effect.

Testimony at the hearing by Lottie Mittleman, a former clerical worker at the 82nd Avenue building, corroborated the tenants' statements. The building contained 101 apartments, and Mittleman testified that in the fall and winter of 1979, in accordance with Weinberg's instructions, she prepared 8-10 eviction petitions each month. Each petition contained Weinberg's sworn statement that the rent had been demanded after it had become due and before the eviction petition had been prepared. Mittleman testified that to her knowledge, however, no member of the building staff had ever made a demand for payment of rent. She once asked Weinberg whether such a demand had been made and she was told simply to prepare the petitions and not to ask questions. Weinberg further instructed Mittleman that if a tenant who received an eviction notice complained that the rent had been paid, she was to tell the tenant to seek relief in court. Mittleman testified that Weinberg once asked her to testify falsely at an eviction proceeding that she had made a demand for rent, but she refused to do so.

Mittleman testified that Weinberg routinely charged rents in excess of those permitted under New York's rent stabilization guidelines. He instructed her that if a tenant were to inquire about the rent history of an apartment in order to determine whether the current rent was within the permissible range, she should tell the tenant that the old leases had been destroyed. To her knowledge, the old leases had not been destroyed.

James Felder, former superintendent of the 82nd Avenue building, testified that Weinberg had removed the sign in the lobby notifying tenants of their rights under the rent stabilization law. Like Mittleman, Felder had been asked by Weinberg to swear falsely at an eviction proceeding that Felder had demanded the rent.

Felder also testified with respect to Weinberg's attempts to frighten and use force against the elderly and low-paying tenants of the building. He testified that Weinberg had encouraged alcoholics to loiter in the building, provided them with wine, and instructed Felder not to bother them because he wanted them to frighten the tenants. Felder testified that Weinberg asked him whether he knew of anyone who might be willing to rob or assault some of the elderly tenants (McGhee similarly testified that Weinberg asked McGhee to arrange for someone to "brush[ ] against or rough[ ] up" tenants in the elevators and corridors) to encourage the tenants to move out. In addition, Felder testified that there was an elderly woman in the building who had complained to local authorities about lack of heat; Weinberg asked Felder whether he knew of anyone who would be willing to rape the woman.

We conclude that the evidence was ample to support the district court's findings that Weinberg had committed arson, fraud, and extortionate acts.

### C. *The Denial of Counsel's Motion To Withdraw*

■ At the start of the sentencing hearing on October 29, 1987, Jerome Karp, one of the two attorneys representing Weinberg, moved to withdraw from the case and requested a continuance so that substitute counsel would have time to prepare for the hearing. The ground for the application was that Karp had learned the previous day that Weinberg was cooperating with the government in an investigation into judicial selection practices in Brooklyn, and that Karp "object[ed] to using this client in a manner in which this client has been used and I will not lend myself to such a thing."

The court denied the motion and required Karp to proceed. Weinberg contends that this denied him the effective assistance of counsel. We disagree.

The district court has broad discretion to grant or deny a request for a continuance, and "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849–50, 11 L.Ed.2d 921 (1964)). The reviewing court will not reverse absent a showing both of arbitrariness and of prejudice to the defendant. *See United States v. Rodgers,* 755 F.2d 533, 539 (7th Cir.), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985). Weinberg has not met any part of this test.

Preliminarily, we note that at all pertinent times Weinberg had been represented by both Karp and his cocounsel Roger Bennet Adler. The transcript relating to Karp's request to withdraw indicates that Adler had been contemporaneously informed of Weinberg's cooperation in the government's investigation and that nondisclosure to Karp had been instigated by Weinberg. Further, though Karp stated that Weinberg did not oppose Karp's motion, there was no suggestion that Weinberg joined in the motion.

The grounds stated by Karp for withdrawal were insufficient to warrant any further delay in the proceedings. He stated merely an abstract "philosophical[ ]" distaste for appearing to associate himself with his client's cooperation and did not point to any conflict of interest between himself and Weinberg. His philosophical misgivings did not appear to have any relationship to the merits of Weinberg's position or to the testimony to be given at the hearing. Thus, the interest to be served by the requested withdrawal and delay had at best a tenuous connection with Weinberg's own interests and did not appear to be substantial.

It was hardly unreasonable for the court to insist that there be a more substantial reason for allowing any further delay in the proceedings. The prosecution had begun some 16 months earlier; Weinberg's plea of guilty to the RICO count had been entered nearly seven months earlier; and the sentencing hearing had been postponed several times. When Karp made his application on October 29, three witnesses were already present in court. They included at least one who had been identified by Karp as a "vital" witness and another who was scheduled to be transferred out of New York City about 10 days later. Those witnesses who were not government employees had come to court that day at some considerable inconvenience to themselves and their employers.

Finally, there is no showing that Weinberg was in any way prejudiced by Karp's continued representation of him. Though Karp did tell the district court, "I have had a rather sleepless night. I have not been able to do the things that I would do to prepare for this hearing today," we are unpersuaded that any unpreparedness was causally related to the grounds of Karp's motion. The issues to be aired at the hearing had long since been defined; both sides had made extensive written presentations; and six weeks before the hearing, Karp had identified the witnesses whose presence at the hearing he believed critical. Some of the cross-examination was to be conducted by Adler, and the district court was entitled to discredit the suggestion that Karp had put off any significant preparation of his own until just one day before the hearing. In fact, either Adler or Karp ably cross-examined the government's witnesses at the hearing on October 29 and at the continuation of the hearing several days later. The record provides no basis whatever for concluding that Weinberg was prejudiced by the denial of Karp's motion to withdraw.

### D. *The Alleged Breach of the Plea Agreement*

■ Finally, Weinberg argues that the "content, tenor and tone of the government's pre-sentencing submissions violated the plea agreement." He contends that the government's presentation—which not only informed the court of his activities but commented on their seriousness and sug-

gested that he owed a large debt to society—was so aggressive in its condemnation of his actions that there could be no doubt that the government advocated a heavy sentence. We are unpersuaded that the government violated the agreement.

The agreement provided that the government would "make no specific recommendations with respect to sentencing," but it also reserved to the government the right to detail to the court "the nature and extent of Samuel Weinberg's criminal activities." The agreement did not require the government to confine its presentation to a dry factual recitation without editorial comment. Though the very nature of the offenses and the vividness of the government's descriptions may have suggested that a substantial punishment would be appropriate, the government in fact made no specific sentencing recommendation. We conclude that the government's presentation was within the terms of the plea agreement. If Weinberg wished to place greater restraints on that presentation, it was incumbent upon him to insist on their inclusion in the agreement.

### CONCLUSION

The judgment of conviction is in all respects affirmed.