998 F.2d 1011
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Fleming MONTGOMERY, Defendant-Appellant.
 No. 91-5690.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 6, 1993.
Decided: July 13, 1993.
 
 Appeal from the United States District Court for the Western District of Virginia, at Roanoke. James C. Turk, Chief District Judge. (CR-91-35-R)
 Vincent Austin Lilly, John Gregory, Jr., Salem, Virginia, for Appellant.
 Miriam Rachel Eisenstein, United States Department of Justice, Washington, D.C., for Appellee.
 John R. Dunne, Assistant Attorney General, James P. Turner, Deputy Assistant Attorney General, E. Montgomery Tucker, United States Attorney, Tom Bondurant, Assistant United States Attorney, Jessica Dunsay Silver, United States Department of Justice, Washington, D.C., for Appellee.
 W.D.Va.
 AFFIRMED.
 Before HAMILTON and LUTTIG, Circuit Judges, and HEANEY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 David F. Montgomery appeals his convictions for: (1) killing an informant or witness, 18 U.S.C. §§ 1512(a)(1)(A) and 1512(a)(1)(C); (2) the use of a firearm in the commission of a crime of violence, 18 U.S.C. § 924(c); and (3) being a convicted felon in the possession of a firearm, 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Montgomery challenges his convictions on the grounds that the evidence was insufficient to support his convictions and the district court committed reversible error in admitting certain evidence.
 
 
 2
 In addition, Montgomery challenges his guilty pleas to two counts of arson/attempted arson and one count of conspiracy to commit arson of a building used in or affecting interstate commerce, (hereinafter collectively referred to as the "arson counts"). 18 U.S.C. §§ 844(h), 844(i), and 371. On appeal, Montgomery asserts the district court had no jurisdiction over the arson counts because there was no showing the home burned was used in or affected interstate commerce. Therefore, Montgomery contends his plea of guilty to these counts was void.[1]
 
 
 3
 We find no reversible error and affirm the judgment entered by the district court on Montgomery's convictions both by the jury and his guilty pleas.
 
 
 4
 * On February 10, 1991, Danny Bostic was shot in the face and killed by a gunman firing through the windows of his home. His wife, Patty, was also wounded but she recovered from her injuries. In the years preceding Danny Bostic's murder, Danny Bostic and his wife Patty had befriended David Montgomery. In 1990, Montgomery was on parole from a long prison term and living in a halfway house in Roanoke, Virginia. Danny and Patty Bostic were living in Roanoke and Montgomery was a frequent visitor in their home. Montgomery even brought some of his girlfriends, including Linda Wells and Mary Martin, who later became witnesses in his trial, to the Bostic home, and the Bostics kept and cared for Montgomery's dog.
 
 
 5
 Mary Martin began dating Montgomery in the summer of 1990 while he was living in the Embassy Motor Lodge Halfway House in Roanoke. Mary Martin testified that, in July 1990, she and Montgomery drove to Bristol, Tennessee, where Montgomery robbed a jewelry store at gunpoint. Mary Martin continued her involvement with Montgomery for several months, during which they lived together for a short time. She stated she became afraid of him because Montgomery made it clear that he would "never leave any witnesses behind" and would subject informers to a terrible revenge. (Joint Appendix (J.A.) 243-244).
 
 
 6
 Montgomery moved from Mary Martin's house in October 1990 to his hometown of Narrows, Virginia, which is approximately fifty miles west of Roanoke. Around the end of October 1990, Martin testified Montgomery told her he was hired by John Simms to burn a house recently purchased by a black family. On October 26, Mary Martin accompanied Montgomery on a visit to Simms and afterwards she went with him to the Bostic house where Montgomery borrowed a gas can from Danny Bostic. Circumstantial evidence strongly indicates Danny Bostic knew, on the date of the first arson, that Montgomery was going to torch the house. Danny Bostic asked to accompany a friend, Rick Correll, to work that night in order to establish an alibi for his whereabouts. Correll testified that Danny told him he didn't want to be implicated in what Montgomery was up to. He also told Correll he was keeping a diary of his activities that night to establish, should it become necessary, where he was. Mary Martin further testified she accompanied Montgomery to a gas station, where he filled the gas cans, and then to the house that was ultimately burned. Mary Martin also stated that the first attempt to burn the house was unsuccessful and she accompanied Montgomery on Halloween night to make the second, this time successful, attempt to burn the house. Although Mary Martin remained in the vehicle as Montgomery burned the house, she testified that Montgomery admitted to her that he set the house ablaze.
 
 
 7
 Fearing David Montgomery, in early December 1990, Danny Bostic made several calls to David's brother, Leo Montgomery. Leo Montgomery testified that Danny Bostic asked him to get David to leave him and his family alone and threatened to go to the federal authorities about David if he didn't. Leo Montgomery testified that he told David about these calls. Soon thereafter, the Bostics, Mary Martin, and Rick Correll went to the authorities in the hope they could have Montgomery arrested. Danny Bostic approached Montgomery's federal probation officer, William Ross, on December 10, 1990 and continued to make contact with him during the next month. Ross then contacted other law enforcement officials, federal and local, about crimes allegedly committed by David Montgomery, including armed robbery, arson, and possession of firearms, all of which would have qualified as parole violations.
 
 
 8
 The Bostics became convinced Montgomery broke into their house around Christmas 1990. Montgomery told Linda Wells that Christmas 1990 was "going to be [the Bostics] last." (J.A. 534-35). On January 8, Parole Officer Ross, Danny Bostic, Mary Martin, and Rick Correll met with Don Harris, a Special Agent of the Bureau of Alcohol, Tobacco and Firearms (ATF).
 
 
 9
 As a result of this meeting, the Franklin County and federal authorities began looking into the arsons of the black family's home, allegedly committed by Montgomery. On January 17, the same group and two detectives from Bristol, Tennessee, met to discuss the armed jewelry store robbery in Bristol that occurred in July 1990. As a consequence of that meeting, the Bristol authorities obtained a warrant to arrest Montgomery for armed robbery.
 
 
 10
 Frank Triplett, a sometimes friend of Montgomery's, accompanied him to the Bostics' home on January 17, 1991 to get Montgomery's dog. Triplett testified that at that time, Danny Bostic told Montgomery he had gone to the FBI, and Montgomery responded: "I already know that." As they returned to the car, Triplett stated Montgomery said: "I ought to kill the bastard" and "I done picked at him a little at a time, but now I'm going to kill him." (J.A. 722-23). William Shank was at the Bostic home when Montgomery and Frank Triplett came for Montgomery's dog. Shank testified that Danny Bostic asked Montgomery "[did you] come by to kill me?" and Montgomery responded "you can be taken care of any time, any place ... I will get you though." (J.A. 740-41). Linda Wells was at the house and also heard this exchange between Montgomery and Danny Bostic.
 
 
 11
 On January 25, 1991, Montgomery was arrested by the FBI as a fugitive on the basis of the Bristol warrant and held in the Roanoke jail pending extradition to Tennessee. FBI Agent John Terry testified that when Montgomery was arrested he said people were "always accusing him of things he didn't do" and then stated he knew who was responsible for his arrest. (J.A. 983). On January 29, 1991, ATF Special Agent Harris, together with Investigator Cundiff of the Franklin County Sheriff's Department interviewed Montgomery in the Roanoke jail. After Montgomery waived his Miranda rights, the interview was recorded. It was primarily concerned with the alleged arsons, however, Montgomery spoke repeatedly about Danny Bostic and his belief that Bostic was the informer responsible for his present incarceration. His tirade against Danny Bostic began with hints about an unnamed drug dealer known to Montgomery, who "ain't getting busted," and he went on to claim several people were calling his relatives saying: "I'm going to get David busted." "I have been set up. I have already been set up." Montgomery added:
 
 
 12
 I brought a dude a new motorcycle ... guy right now's got all kinds of stuff of mine. He's even got my dog ... why does David Montgomery hate a certain guy ... they don't sleep too good because they ran around with my wife. They took my money ... yes, we were [friends] ... his name's Danny Bostic.
 
 
 13
 (J.A. 1132-34). Montgomery went on to infer that if the authorities watched Danny Bostic's house, they would discover he was dealing drugs.
 
 
 14
 The other person he accused of informing on him was his former girlfriend, Mary Martin. Martin testified that Montgomery called her from the Roanoke jail and insisted Danny Bostic"made her do it." (J.A. 452-53).
 
 
 15
 While in the Roanoke jail, Montgomery spoke about Danny Bostic to other inmates as well. Richard Simmons, who was a trustee, testified that Montgomery told him "I hate a snitch." According to Simmons, Montgomery said Danny Bostic was a "snitch" who knew about a "Tennessee jewelry store that [Montgomery had] pulled off" and Bostic was going to "snitch on him" and, finally, "he had to do what he had to do." Simmons asked him what that was, and Montgomery said: "I've got to kill him because I hate a snitch." (J.A. 95960).
 
 
 16
 On February 7, 1991, Montgomery was extradited to Tennessee for the jewelry store robbery. On February 8, 1991, an old girlfriend of Montgomery's, Mary Tebault, drove from Giles County, Virginia to Bristol, Tennessee to bail Montgomery out of the Tennessee jail. Early on Saturday morning, February 9, Montgomery was released. According to Mary Tebault's testimony, she dropped Montgomery at the home of Pam and Harold McDaniels near Narrows. She then testified that Montgomery walked over to his brother Leo's home and picked up his car. Tebault then left the McDaniels' house and drove to the Rendez-Vous Motel where Montgomery was staying. David Montgomery and another of his brothers, Roy Lee, were sitting in a truck across the street. They called her over. Roy Lee gave her money, and on their instructions she went to a store where she bought approximately two boxes of .38 caliber bullets. After delivering the ammunition to David and Roy Lee Montgomery, she then left.
 
 
 17
 According to Mary Tebault, she next encountered David Montgomery in the early evening of the same day at Mary Tebault's daughter's house in Peterstown, West Virginia. They drove together to a trailer at the nearby "Koon Lodge" where they stayed briefly. They then drove to the home of a family named Keffer where they stayed fifteen or twenty minutes. Mary Tebault then returned Montgomery to the trailer at Koon Lodge.
 
 
 18
 The next day, February 10, Tebault picked up Montgomery at the Koon Lodge and at that time she observed a revolver tucked in the back of his pants. The two drove around, staying briefly in a motel in Covington, Virginia, and then left on late Sunday afternoon. Montgomery directed her to drive to Roanoke and along the way his mood, according to her, became increasingly agitated and angry. At one point, when they stopped for a rest, she observed the gun in the glove compartment, but later noticed it was no longer there.
 
 
 19
 When they arrived in Roanoke late that night, according to Tebault, Montgomery directed her to a street and a neighborhood she recognized as the area in which the Bostics resided, having previously been there with Montgomery to check on his dog. She let David Montgomery out and then, per his instructions, drove back to Giles County.
 
 
 20
 It was that night, approximately between eleven and twelve midnight, that someone knocked on the Bostics' door. Patty Bostic asked who was there, and upon not recognizing the voice, she called for Danny to bring a gun. As Danny entered the front room of the house, shots rang out. Danny Bostic was killed and Patty Bostic was wounded. Patty noted that their dog never barked and later was discovered to be loose. A neighbor, Jerry Carver, on his nightly walk shortly after eleven p.m., noticed the dog that was ordinarily in the Bostics' yard was loose and there was a big man with wide shoulders walking in the vicinity. On the route back from his walk, Carver heard shots.
 
 
 21
 Evidence showed that Danny Bostic and his wife were both shot with a .38 or .57 caliber gun at close range. Danny Bostic had been shot through the window in the front door and Patty through the south window. The bullets that hit Danny and Patty both came from the same gun.
 
 
 22
 Mongomery was due in court in Tennessee on Tuesday, February 12, 1991, two days after Danny Bostic was killed, but he failed to appear. Instead, he disappeared for several days, and was finally arrested in Roanoke on February 15, 1991. Detective Neil Tolrud interviewed Montgomery on February 15, in jail, pursuant to a signed waiver of his Miranda rights. When asked to account for his whereabouts from February 10 to February 15, Montgomery could not give a coherent or consistent story. His story generally followed the same line as Mary Tebault's until they left the motel early Sunday evening. Then he said he was in his hometown, Narrows in Giles County, Virginia on Sunday and after that he stayed at Ralph Montgomery's cabin for the remainder of Sunday and the next two days. Later in the interrogation, he specifically stated that on Sunday night between ten p.m. and two a.m., he was in Princeton, West Virginia, where Billy Keffer lives. After this he returned to his assertion that he was back in his hometown of Narrows on Sunday night before midnight. Keffer testified, however, it was Saturday night only that Montgomery and Mary Tebault came to his house and Ralph Montgomery stated that he housed David Montgomery Monday night through Thursday, February 11-14, the week following the murder, not on Sunday. Ralph Montgomery testified he drove David Montgomery to the home of a family named Spangler on Thursday night, and when he came to get him on the morning of Friday, February 15, the police were already there. On the evening of February 15, 1991, Mary Tebault's roommate, Lynn Gayheart, received a phone call from Montgomery, who was in the Roanoke jail, instructing her to tell Mary to "find a witness for between ten and two o'clock Sunday night." (J.A. 900-01).
 
 
 23
 On March 12, 1991, a grand jury returned an eleven count indictment against David Montgomery and John Simms. Counts one through five and seven through nine applied to David Montgomery or to both he and Simms, while counts six, ten, and eleven applied to Simms alone. Count one charged that Montgomery conspired to use a fire in commission of a civil rights felony and conspired to commit arson of a building used in interstate commerce. 18 U.S.C. §§ 844(h); 844(i) and 371. Count two charged that Montgomery conspired to injure, oppress, threaten, and intimidate the black family whose house was burned in the free exercise and enjoyment of their right to purchase, hold and occupy a dwelling without injury. 18 U.S.C. § 241. Count three charged Montgomery with a violation of 18 U.S.C. § 1512 in murdering Bostic in order to prevent him from testifying or informing law enforcement officials about possible federal offenses.
 
 
 24
 Count four charged Montgomery with the use of a firearm in the process of committing the murder of Danny Bostic. Count five charged Montgomery with the knowing possession of a weapon by a convicted felon, 18 U.S.C. § 922(g)(1) and § 924(e)(1), and counts seven, eight and nine charged Montgomery with the substantive violations of the conspiracy charges in count one, i.e., use of a fire to commit a civil rights offense and twice destroying or attempting to destroy a dwelling used in interstate commerce.
 
 
 25
 On March 20, 1991, Montgomery pleaded not guilty to all counts. On July 1, 1991, just prior to trial, the defendant appeared and requested permission to change his plea to guilty on counts one, two, seven, eight, and nine. The district court initially would not permit him to plead guilty to the conspiracy counts because Montgomery insisted he had acted alone and that there was no conspiracy. Thereafter, the defendant asked to enter Alford guilty pleas to the two conspiracy counts.[2] The district court specifically informed Montgomery that if he went to trial on the arson counts, the government would have to prove the house which the defendant was accused of burning was used in or affected interstate commerce. After being so advised, Montgomery entered a guilty plea to those counts.
 
 
 26
 Having disposed of the only counts David Montgomery had in common with John Simms, the court severed the Simms' case and Montgomery went to trial. A jury trial began on July 1, 1991. On July 10, 1991, the jury returned a verdict of guilty on all three remaining counts.
 
 
 27
 On October 4, 1991, the defendant was sentenced for each of the eight counts. For count three, murder of a witness or informant, the district court sentenced Montgomery to life imprisonment. For count five, possession of a weapon, the court sentenced him to fifteen years to be served concurrently. For each of the other counts, Montgomery was sentenced to five years to be served consecutively to count three and to each other. In addition, the court levied a special assessment against Montgomery and ordered him to pay restitution of $2,866.25 to Patty Bostic. This appeal followed.
 
 II
 
 28
 Montgomery asserts the district court had no jurisdiction over the arson counts because the home which Montgomery burned was not shown to be used in or affecting interstate commerce.
 
 
 29
 Although the legislative history suggests Congress may not have intended § 844(i) to cover all private homes, see Russell v. United States, 471 U.S. 858 (1985), the statute does not preclude the possibility that a private home can be shown to affect interstate commerce. The Seventh Circuit recognized this when it held a private home that receives natural gas from out of state is in or affecting interstate commerce for the purposes of § 844(i). United States v. Stillwell, 900 F.2d 1104 (7th Cir.), cert. denied, 111 S. Ct. 111 (1990).
 
 
 30
 The government concedes it did not attempt to establish that the building was used in or affected interstate commerce, however, Montgomery, by pleading guilty to these counts, waived any right to insist on proof of that element. A valid guilty plea constitutes an admission of all material elements of a crime. McCarthy v. United States, 394 U.S. 459, 466 (1969). It is an accepted rule of law that a plea of guilty admits all elements of a criminal charge and waives all challenges except challenges to a court's jurisdiction. See, e.g., Hayle v. United States, 815 F.2d 879, 881 (2d Cir. 1987). However, "[i]f the indictment alleges all of the statutory elements of a federal offense and the defendant's contention is that in fact certain of those elements are lacking, the challenge goes to the merits of the prosecution, not to the jurisdiction of the court...." United States v. Weinberg, 852 F.2d 681, 684 (2d Cir. 1988) quoting Hayle, 815 F.2d at 882. "In order for a defendant who has pleaded guilty to sustain a challenge to the district court's jurisdiction, he must establish that the face of the indictment failed to charge the elements of a federal offense." Mack v. United States, 853 F.2d 585, 589 (8th Cir. 1988); Weinberg, 852 F.2d at 684. A plea of guilty concedes that the allegations of the indictment that form the basis of federal jurisdiction are correct. In light of Stillwell, it is possible the government could have established a sufficient interstate commerce connection. The indictment plainly alleged such, and the district court properly had jurisdiction based on the indictment. The district court specifically informed Montgomery that the government would be required to prove the interstate commerce connection if he went to trial. Montgomery, nonetheless, chose to enter guilty pleas to the arson counts. Montgomery, therefore, waived his right to challenge that element of the offense.
 
 III
 
 31
 Montgomery next asserts that the district court committed reversible error by admitting improper testimony at trial. While we agree that certain of the evidence objected to by Montgomery should have been excluded by the district court, we find the admission of such evidence was, at best, harmless error in the light of the overwhelming evidence of Montgomery's guilt. We discuss our reasons with respect to each alleged error separately.
 
 
 32
 * Montgomery first argues it was improper to admit the testimony of ATF Special Agent Donald Harris as to the discussions at meetings with Danny Bostic, Mary Martin, and Rick Correll, on the ground that such communications were hearsay. The statements, as the government correctly points out, were not hearsay at all. They were not introduced to prove the truth of the matters asserted by Bostic and others. Succinctly stated, evidence of these discussions was not used to prove the defendant committed civil rights violations or arson; they were admitted to prove that Danny Bostic had information about Montgomery's commission of crimes and he was, therefore, a potential informer and witness against Montgomery. See United States v. Love, 767 F.2d 1052, 1063-64 (4th Cir. 1985) (holding a statement of a federal agent regarding a tip he received on an impending drug transaction was not hearsay because it was used to explain the impetus of the investigation, not that the drug transaction actually occurred).
 
 B
 
 33
 Montgomery next argues that statements he made to a police detective were improperly admitted because his counsel was not present at the interrogation. As part of its case, the government called Detective K.W. Kern, a Roanoke police officer, who investigated the murder of Bonnie Mullins, a friend of Montgomery's. Detective Kern interviewed David Montgomery in the Roanoke jail after the Mullins' murder. Kern testified he went to see Montgomery to find out whether he could provide information on the Mullins' murder. Montgomery was not a suspect in the murder of Mullins because it had taken place while he was in jail. When asked about Mullins, however, the defendant stated Bonnie Mullins was killed for a different reason than Danny Bostic. Kern testified he did not ask about Danny Bostic. Montgomery argues on appeal that his rights under Miranda v. Arizona, 384 U.S. 436 (1966), were violated by the admission of this testimony because he was in custody and Detective Kern neither went through counsel nor advised him of his right to remain silent.
 
 
 34
 The district court correctly held Miranda rights were not implicated because Montgomery was not a suspect in the Mullins' case. McNeil v. Wisconsin, 111 S. Ct. 2204, 2207-08 (1991), established that police are not obliged to go through counsel to question a defendant about a crime unrelated to the one for which he is in custody. The government admits that had Montgomery been the focus of the Mullins' inquiry, Detective Kern would have been obliged to advise him of his Miranda rights.
 
 
 35
 Montgomery asserts that even accidental and inadvertent confessions are protected. However, in Maine v. Moulton, 474 U.S. 159 (1985), the Supreme Court held the Sixth Amendment is not violated whenever "by luck or happenstance, the state obtains incriminating statements from the accused after the right to counsel has attached." Id. The voluntary inculpatory statements Montgomery made to Detective Kern were, therefore, properly admitted into evidence.
 
 C
 
 36
 Montgomery further argues that, in several instances, testimony was admitted which was irrelevant to the issues being tried, and that this testimony was prejudicial to his case because it reflected badly on his character. The government responds that although the testimony in question may have incidentally reflected on Montgomery's character, it was nonetheless admissible.
 
 
 37
 Fed. R. Evid. 404(b) prohibits the admission of evidence merely to show a defendant's bad character and to show the defendant acted in conformity therewith. This rule, however, does permit such evidence if it is used for some other purpose such as to show motive, plan, opportunity, or intent. In the Fourth Circuit, Rule 404(b) is considered to be one of inclusion rather than exclusion; that is, the evidence, if relevant, must be excluded only if "the trial judge believes that there is a genuine risk that the emotions of the jury will be excited by undue prejudice and that this risk is disproportionate to the probative value of the offered evidence." United States v. Masters, 622 F.2d 83, 87 (4th Cir. 1980) quoting Trautman, Logical or Legal Relevancy-A Conflict in Theory, 5 Vand. Law Rev. 385, 410 (1951-52).
 
 
 38
 With respect to Rule 404(b) evidence, it is admissible if: (1) it is relevant to an issue other than character; (2) it is necessary in that it supports an essential element, or provides the context of, the crime; (3) it has some indicia of reliability; and (4) under Fed. R. Evid. 403, its relevance is not substantially outweighed by the danger of unfair prejudice. United States v. Bailey, 990 F.2d 119, 122 (4th Cir. 1993), citing United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir. 1988); see also Masters, 622 F.2d at 86 (noting the"necessary" element is present where the evidence provides the context of the crime).
 
 
 39
 The evidence in question relates to the charge that Montgomery killed Danny Bostic to prevent him from testifying or giving information to federal authorities. 18 U.S.C. §§ 1512(a)(1)(A) and (a)(1)(C). As such, its relevance must be viewed in light of the elements of that offense. The first element, obviously, is the defendant must have killed or attempted to kill another person. 18 U.S.C. § 1512. The second element requires that the person must be a potential or probable witness or informant. Id. Congress and the courts have given broad definitions to the terms "witness" and "informant." A person who is a witness is one who knows or was supposed to know material facts and was expected to testify or had testified. See, e.g., United States v. Griffin, 463 F.2d 177 (10th Cir. 1972). A witness need not be subpoenaed, and a person is still a witness even if he has been excused. See, e.g., United States v. Wilson, 796 F.2d 55 (4th Cir. 1986). In 1986, § 1512 was amended to also protect informants and victims, and the legislative history indicates § 1512 was meant to protect informants before they even give information to law enforcement officers. S. Rep. No. 97-532, 97th Cong., 2d Sess. 30 reprinted in 1986 U.S.C.C.A.N. 2515, 2536. The government must show a defendant intended to cause the person to be absent from a proceeding or to prevent communications to law enforcement officers. See, e.g., United States v. Scaife, 749 F.2d 338 (6th Cir. 1984).
 
 
 40
 Among the evidence which Montgomery objected to was the testimony of Mary Martin that she accompanied Montgomery to Tennessee where he robbed the jewelry store. The testimony concerning the Bristol jewelry store robbery, however, played so many times in the res gestae of the offenses for which Montgomery was charged that it was inextricably intertwined with the central narrative of the government's case against Montgomery.
 
 
 41
 One of the accepted bases for the admissibility of evidence of other crimes arises when such evidence furnishes part of the context of the crime or is necessary to a full presentation of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its environment that its proof is appropriate in order to complete the story of the crime on trial by proving the immediate context or the res gestae, or the uncharged offense is so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other ... and [is thus] part of the res gestae of the crime charged. And where evidence is admissible to provide this full presentation of the offense there is no reason to fragmentize the event under inquiry by suppressing parts of the res gestae. The jury is entitled to know the setting of the case. It cannot be expected to make its decision in a void-without knowledge of the time, place and circumstances of the acts which form the basis of the charge.
 
 
 42
 United States v. Dudley, 941 F.2d 260, 262 (4th Cir. 1991) quoting United States v. Masters, 622 F.2d 83 (4th Cir. 1980).
 
 
 43
 Because of the jewelry store robbery, Montgomery was in the Roanoke jail at the end of January 1991. The arrest for this armed robbery appears to have been the event which convinced Montgomery that his friends were informing on him. It was in jail that Montgomery talked to Special Agent Harris and to several other prisoners, in each case accusing Danny Bostic of informing on him. And finally, it was his Tennessee court date that Montgomery missed because he was evading arrest after Danny Bostic's murder. When another crime's evidence is an integral part of the circumstances surrounding the charged offense and is reasonably necessary to complete the story of the offense, that evidence of the other crime is admissible. See, e.g., United States v. Fortenberry, 971 F.2d 717, 721 (11th Cir. 1992); United States v. Petary, 857 F.2d 458, 462 (8th Cir. 1988).
 
 
 44
 Montgomery also objected to Mary Martin's testimony that he burned the black family's home. This evidence, however, had a high degree of relevance to the offense of tampering with an informant or witness because this testimony provided the necessary connection between the offense, Montgomery, and Danny Bostic's knowledge of that offense. This evidence was necessary in order to show Danny Bostic had knowledge of Montgomery's criminal activity which he could report to the law enforcement authorities and bear witness thereto, and was also relevant to show Montgomery's motive for killing Danny Bostic. In a trial for tampering with a witness, 18 U.S.C. § 1512, the jury should know of the offense to which the witness or informant had knowledge in order to properly assess a defendant's motive and the intensity of that motive. United States v. Bradwell, 388 F.2d 619 (2d Cir. 1968).
 
 
 45
 Montgomery's further objections as to evidence admitted under Rule 404(b) cannot be as easily surmounted. Patty Bostic testified that shortly after Montgomery was paroled in late 1988, he said to her that he would "get back at people who had done stuff to him":
 
 
 46
 One of the things [he said] was [that] if there was a man he said he wanted to get back at, he would build this big box and cut a hole in it and fix it so he could put a rat in there and the rat could slowly gnaw away at the guy, you know, to kill him. And a woman, he would take a rubber hose ... and put it around barbed wire and then put it up inside the woman and then pull the hose out. And he would tell of things like people he had killed in prison....
 
 
 47
 (J.A. 221).
 
 
 48
 On the objection of Montgomery's counsel, the district court agreed the statement was not relevant; however, the court did not strike the testimony or give a curative instruction. (J.A. 22). The government asserts this statement was relevant to show potential witnesses were afraid of Montgomery. The statement does indicate that those who heard it might have reason to fear Montgomery, but it is in no way relevant to prove Montgomery killed Danny Bostic to prevent him from imparting incriminating information to federal authorities. If the statement was made to Danny Bostic with the intent to intimidate him from giving information, it might have some justifiable relevance, however, there was no indication Montgomery made the statement for that purpose or that it was even directed at Danny Bostic or that he even knew of the statement. Furthermore, the statement, by Patty Bostic's own admission, was made shortly after Montgomery's release from prison in late 1988, long before the events connected with the subject charges. It, therefore, far preceded the criminal activity about which the government alleges Danny Bostic could have given information. In short, assuming that such statements as this constitute "acts" within the meaning of Rule 404(b), this is precisely the type of evidence which the Rule prohibits, i.e., evidence of bad character used to show the defendant acted in conformity therewith. In light of the irrelevance of the statement, which the district court recognized, the district court abused its discretion when it did not strike that part of Patty Bostic's testimony or give a curative instruction. See United States v. Peed, 714 F.2d 7, 10 (1983); United States v. Lamperty, 778 F.2d 59 (1st Cir. 1985).
 
 
 49
 In a similar vein, Mary Martin was permitted to testify Montgomery stated: "he would like to get up on a hill and take a machine gun and kill every nigger that came along." (J.A. 422). While this testimony would be relevant if Montgomery were being tried for the civil rights violations, he had pled guilty to those offenses before his jury trial began. His motivation for committing the civil rights violations was irrelevant to prove any element of the offense for which he was being tried-tampering with an informant or witness. The statement in no way makes it appear more likely that Montgomery killed Danny Bostic to prevent him from giving information about the civil rights violations. Although, as stated above, in a tampering case, a jury should know of the offense to which the witness or informant had knowledge in order to properly assess a defendant's motive and the intensity of that motive, United States v. Bradwell, 388 F.2d 619 (2d Cir. 1968), Mary Martin's testimony about Montgomery's desire to shoot blacks went solely to the motive for the arson offenses and did not aid the jury in understanding Montgomery's motive for killing Danny Bostic. The district court must exercise great caution with respect to this kind of testimony due to the danger that the jury might convict the defendant for the offense of which the informant had knowledge and not for the offense of killing the informant. It was an abuse of discretion to admit Mary Martin's testimony concerning Montgomery's hatred of blacks.
 
 
 50
 Mr. Keith Craighead, the owner of the house which Montgomery admittedly burned, was also permitted to testify concerning the arsons. His testimony was limited solely to the circumstances of the fires of October 26 and 31, 1990. He had no knowledge of the cause of the fires or of Montgomery's involvement. Mr. Craighead's testimony was not so egregious because it only concerned the fact the fires occurred. Nevertheless, Mary Martin had already given testimony of Montgomery's involvement with the torching of the black family's home. Furthermore, her testimony concerning the arsons helped establish that Danny Bostic knew of the first fire, if not the second, and, therefore, was a potential informant or witness concerning the arson. To allow further testimony concerning the arsons treads perilously close to the danger of convicting Montgomery for offenses for which he was not being tried, namely the civil rights violations. Mr. Craighead's testimony, however, is viewed in a somewhat different light because counsel for Montgomery failed to object to its admission. Montgomery, therefore, has effectively waived this issue, and we will not disturb the district court's admission of the evidence in the absence of plain error. United States v. Mendez-Ortiz, 810 F.2d 76, 78 (6th Cir. 1986), cert. denied, 107 S. Ct. 1384 (1987).
 
 
 51
 The plain error rule is to be used sparingly and only to correct "particularly egregious errors" that affect "substantial rights." See United States v. Young, 470 U.S. 1, 15 (1985); Fed. R. Crim. P. 52(b). Though the evidence was prejudicial to Montgomery, it was part of the res gestae of the government's case and reflected somewhat on Montgomery's motive to kill Danny Bostic. Furthermore, the district court gave the jury a cautionary instruction that Montgomery was not being charged for the arsons and it could only be used as evidence of motive for the offense of tampering with a witness or informant. Accordingly, we cannot, under our limited power of review, adjudge the district court's admission of Mr. Craighead's evidence to be plain error.
 
 
 52
 Patty Bostic was also permitted to testify, this time over counsel's objection, that it was Montgomery who broke into the Bostic residence around Christmas 1990. This conclusion was apparently based solely on her personal belief and not on any objective evidence. Even if this evidence could somehow be construed as relevant to indicate Montgomery murdered Danny Bostic to prevent him from giving information to federal authorities, it clearly does not meet the requirement of reliability. Before evidence of previous crimes or bad acts can be admitted, there must be proof such that a reasonable juror could find, by a preponderance of the evidence, that the defendant committed the prior act. Huddleson v. United States, 485 U.S. 681 (1988). "In the Rule 404(b) context, similar act evidence is only relevant if the jury can reasonably conclude that the act occurred and that the defendant was the actor." Id. at 689. The government failed to point out any evidence, apart from Patty Bostic's unfounded belief, that Montgomery committed this act and, therefore, it was an abuse of discretion to admit this testimony.
 
 
 53
 Even though the district court abused its discretion by admitting Mary Martin's testimony about Montgomery's desire to shoot blacks and Patty Bostic's testimony concerning Montgomery's fantasies of revenge and the Christmas break-in, it is the duty of this court to view the evidence as a whole and not to reverse on the basis of errors which are harmless. There can be no such thing as a perfect trial, and the Constitution does not guarantee such a trial. United States v. Hasting, 461 U.S. 499 (1983); see also 28 U.S.C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). In Hasting, the Supreme Court indicated an appellate court should apply the harmless error rule in all cases where the error is deemed harmless beyond a reasonable doubt. 461 U.S. at 508-10. Thus, the essence of the harmless error rule is that a judgment may stand only when there is no reasonable possibility the error might have contributed to the conviction. 461 U.S. at 506. In Alston v. Garrison, 720 F.2d 812, 817 (4th Cir. 1983), cert. denied, 468 U.S. 1219 (1984), we found the proper inquiry was whether, viewing the entire record, it is clear beyond a reasonable doubt the jury would have returned a verdict of guilty absent the allegedly harmless error. Applying the foregoing standard of review to the facts of the present case, we believe the evidence erroneously admitted is harmless.
 
 
 54
 There is ample evidence that Montgomery was well aware Danny Bostic knew about the arsons and the jewelry store robbery and that Danny gave information concerning these events to law enforcement authorities. There is testimony Danny himself told Montgomery on January 17, 1991 that he had gone to the federal authorities. The defendant's brother Leo warned Montgomery that Bostic was going to the federal authorities. Frank Triplett testified that Danny told Montgomery he had gone to the FBI and that Montgomery replied he knew that. When the defendant was arrested in connection with the jewelry store robbery, he indicated in no uncertain terms he knew who was informing about him and he identified Danny as the person "out to get him." Though he was aware Mary Martin was also an informer, he blamed Bostic for having her inform on him. There was substantial evidence in the record, albeit circumstantial, to warrant the jury finding Montgomery guilty as charged in the three counts. The timing of the murder itself strongly indicates it was Bostic's informing that resulted in his death. Montgomery told Danny that "I will get you ...," (J.A. 740), and told a fellow inmate that "I've got to kill him." (J.A. 959-60). Soon after Montgomery's release on bond for the armed jewelry store robbery, Mary Tebault, at Montgomery's direction, purchased .38 caliber ammunition for him. She drove Montgomery to the vicinity of Danny Bostic's home in Roanoke and, along the way, she saw Montgomery had a gun. The caliber of the gun was consistent with the caliber of the bullets which killed Danny Bostic and wounded his wife. Immediately after the murder, Montgomery missed a court appearance related to the jewelry store robbery and became a fugitive. Upon his arrest, he could not account for his whereabouts and he even attempted to get Tebault to concoct an alibi for him for the time of the murder.
 
 
 55
 In short, the circumstantial evidence was overwhelming that Montgomery was guilty of murdering Danny Bostic to prevent him from imparting further information to law enforcement authorities or acting as a witness against him. In light of this overwhelming evidence of guilt, the errors alleged are harmless. United States v. Blevins, 960 F.2d 1252, 1262 (4th Cir. 1992) (error in allowing discussion of guilty pleas was harmless in light of overwhelming evidence of defendant's guilt). It simply cannot be said that the jury would have returned a different verdict if the errors were removed.[3]
 
 IV
 
 56
 For the foregoing reasons, the judgment entered by the district court on Montgomery's guilty pleas and jury convictions is hereby affirmed.
 
 AFFIRMED
 
 
 [1]
 Montgomery also pleaded guilty to: (1) the charge of using a fire to commit a civil rights violation, 18 U.S.C. § 844(h) and conspiracy to use fire to commit a civil rights violation, 18 U.S.C.s 371; and (2) conspiracy to injure, oppress, threaten or intimidate a black family in the free exercise and enjoyment of their right to purchase, hold, or occupy a dwelling without injury. 18 U.S.C. § 241. Montgomery does not challenge his pleas of guilty to these offenses
 
 
 [2]
 Under North Carolina v. Alford, 400 U.S. 25 (1970), a defendant may plead guilty at the same time protesting his innocence, but wanting the matter to be resolved without trial. It is a guilty plea and the court may accept it, but the court must hear enough evidence to be convinced that the plea is proper. Little evidence is necessary. United States v. Morrow, 914 F.2d 608 (4th Cir. 1990)
 
 
 [3]
 For the same reasons, we regard Montgomery's contention that the evidence was insufficient to support his convictions as without merit
 Montgomery's contention that Mary Martin was improperly permitted to state she was in the Federal Witness Protection Program is also without merit. A recognized legitimate purpose to permitting such testimony, as the district court did in this case, was to allow the witness to explain why she could not answer where she lived or what she was doing, because failure to answer such a question would seem odd to the jury when every other witness had been asked such questions or was required to provide such information on the witness stand. See, e.g., United States v. Panas, 738 F.2d 278 (8th Cir. 1984).